Ralph **DILLARD** and Dorothy Dillard, and John Caraway, Plaintiffs-Appellants,

v.

Clyde Lewis **EARNHART**, Jr., Clyde Lewis Earnhart, Sr., and Mattie G. Earnhart, his wife, and James E. Miller, Trustee, Defendants-Respondents.

No. 54549.

Supreme Court of Missouri, Division No. 1.

Sept. 14, 1970.

Robert Stemmons, Mt. Vernon, for plaintiffs-appellants.

Neale, Newman, Bradshaw & Freeman, Jean Paul Bradshaw, Warren S. Stafford, Jerrry L. Redfern, Springfield, for defendants-respondents.

WELBORN, Commissioner.

Appeal by plaintiffs from adverse judgment in their action to set aside a deed of trust, or, in the alternative, for damages for breach of warranty against encumbrances.

In the spring of 1966, defendant Clyde Lewis Earnhart, Jr., then 36 years of age, with $4,000 supplied by his parents, defendants Clyde Lewis Earnhart, Sr., and Mattie G. Earnhart, purchased a tavern in Marionville. Clyde, Jr. gave his parents his note for the purchase price. Near the time of the purchase, Clyde, Jr. became a party to a marriage of three weeks' duration. Upon the suggestion of the attorney who represented him in divorce proceedings, Clyde, Jr., on May 26, 1966, executed a deed of trust on the tavern to James E. Miller as Trustee, to secure a $4,000 note from Clyde, Jr. to his parents. The deed of trust was recorded on the date of its execution.

Clyde, Jr. operated the tavern approximately four months, when he became tired of the tavern business. He closed the business and decided to sell it.

Plaintiff Ralph Dillard was a bartender and tavern operator in Springfield. He had recently sold a tavern he owned and operated. Sam Smith told Dillard of the tavern in Marionville being for sale. On August 30, Dillard, accompanied by Sam Smith and Russ Felker, drove to Republic where Clyde, Jr. was working at his father's service station.

Clyde, Jr. went with Dillard and his companions to look at the tavern. Clyde, Jr. asked $3,500 for it. Dillard offered $3,000, but finally agreed to the $3,500 price. Dil-

lard gave Clyde, Jr. $100 earnest money and told him: "I will have the other $3,-400 tomorrow." According to Dillard, he also asked, "Do you want me to get a cashier's check?" and Clyde, Jr. replied, "No, I want the long green, I am going to Louisiana and get a Cajun queen." (Clyde, Jr. denied that he made such a remark.)

The four returned to Republic and told Clyde, Sr. of the projected sale. Clyde, Sr. told Dillard that he and his wife had a deed of trust on the property.

Arrangements were made for Clyde, Jr. to come to Springfield the next day. According to Dillard, Clyde, Sr. said: "There is no problem, while Joe is coming to Springfield, I will go to Mount Vernon and release the mortgage." According to Clyde, Sr., he was agreeable to accepting $3,500 in satisfaction of the mortgage, but, "at no time I never did tell him I would release it unless I got my money."

The next morning, Clyde, Sr. went to the Recorder's Office in Mount Vernon to release the deed of trust. He was unable to do so, however, because he did not have the certified note which the deed secured. He returned home without releasing the deed of trust.

In the meantime, Clyde, Jr. had gone to Springfield to close the sale. He was to meet Dillard at the Blue Ribbon Grill and Bar between noon and one o'clock. The two met there at around 12:30. Dillard said Clyde, Jr. was there when he arrived. Clyde, Jr. said Dillard was in the bar when he got there. The two waited for Sam Smith to appear because Smith was to be a partner with Dillard in the operation. Sam appeared after a time and told Dillard that he couldn't come up with his share of the purchase price. Dillard was ready to go through with the deal and suggested that they go to Parker Moon's office and have Mr. Moon, an attorney, prepare the deed and bill of sale. Dillard and Earnhart went to Moon's office. Moon agreed to prepare the deed and bill of sale. Because he had to see the owner of the Blue Ribbon Grill,

Moon arranged to bring the papers there upon their completion.

Dillard and Clyde, Jr. returned to the Blue Ribbon Grill. After about an hour and a half, Moon arrived at the Blue Ribbon Grill with the deed and bill of sale. He, Dillard and Clyde, Jr. sat in a booth where the instruments were examined and explained to the parties. Mr. Moon described the closing as follows:

"I showed them to Mr. Earnhart, had him read it to make sure everything was right. I asked him where the abstract was, I also said, 'Mr. Dillard, you ought to have the abstract examined before you close this deal.' Clyde Earnhart thought everything was all right except the false mortgage on the place which he had given his Dad to protect him against one of his wives that sued him for divorce. I asked if there was going to be any trouble over there, they said no, they didn't think so. There wasn't any consideration for the mortgage. I said, 'That is not very good business but if that is the way they wanted to close it O.K.' Then they went ahead, he signed his name, then he said he wanted money in cash so Mr. Dillard gave it to him in cash. I said, 'That is quite a bit of cash there.' I think it was around $3200.00, I don't remember around thirty-two hundred and something, I don't remember the exact amount. Anyway he counted it out there, then I told Clyde, 'This is quite a bit of money to be carrying around, you had better let me take you down to the Citizens Bank about a block and a half away and get a cashier's check or make a deposit or I will give you my check, you shouldn't be carrying money around.' He said he was twenty-one and knew what he was doing, he wanted the money, that was it and I left."

Dillard left the Blue Ribbon shortly after Mr. Moon.

There is no necessity for resolving the conflict in testimony as to what Clyde, Jr. consumed at the Blue Ribbon. He testified that he drank beer and Vodka Collins and became ill and intoxicated. Dillard and

Moon said they saw Clyde, Jr. drink only coffee and that he was not intoxicated.

According to Dillard and Earnhart, Sam Smith had joined them in a booth upon their return from Moon's office and was still with them when Moon arrived and the deal was closed. Moon said that Smith was not in the booth, although he did see him nearby.

After Moon and Dillard had left the Blue Ribbon, Smith picked up some dice which, according to Earnhart, Smith had "laying there ready" and said, "Let's roll." The dice were rolled and Earnhart lost $300 to Smith while they were sitting in the booth. Earnhart, Smith and a third person then went to Smith's motel room where the dice game continued and Smith eventually won the $3,400 (less Moon's fee) which had been paid to Earnhart.

Clyde, Jr., returned to his parents' home at around eleven o'clock. He spoke to his father and without the latter's knowledge took a pistol and departed. On September 1, Clyde, Jr. was arrested in an abortive attempt at a bank robbery in Rolla.

On the day after the closing of the transaction, Dillard went to Earnhart, Sr.'s service station in order to get the key to the tavern. He was told that Clyde, Jr. had left. Dillard did not get the key. The mortgage was not discussed. Dillard also went back to the following day to get the key but failed to obtain it. He saw Earnhart, Sr. again, but the mortgage was not mentioned.

The following week, Dillard went to Mount Vernon to record his deed. The recorder told him that Mr. Earnhart had come over on August 31, but had brought the wrong paper and the deed of trust had not been released. On Moon's advice, Dillard recorded his deed. He returned by way of Republic where Earnhart, Sr. told him that he had no intention of releasing the deed of trust, that Dillard was the cause of Earnhart, Jr. getting into trouble.

Dillard never did get the key to the tavern and finally took possession by breaking in.

In February, 1967, Dillard sold the tavern to plaintiff John Caraway. Caraway was fully informed of the situation involving the deed of trust. Caraway testified that he valued the property at $3,000 but gave no testimony as to the consideration he paid.

On September 29, 1967, Dillard and his wife and Caraway brought suit against the Earnharts. Count I of the petition sought cancellation of the deed of trust on the grounds that the Earnharts had falsely and fraudulently represented to Dillard that the deed of trust would be released upon his purchase of the property and that he would receive merchantable title to the land, free and clear of encumbrances. Count II sought $20,000 actual and $20,000 punitive damages against Earnhart, Jr. for fraudulent and malicious breach of the covenant against encumbrances in his deed to Dillard.

The defendants denied the allegations of fraud, alleged affirmatively that the deed from Earnhart, Jr. was void because the grantor was incompetent by reason of intoxication induced by Dillard at the time the deed was executed and that the deed was the product of a scheme by Dillard to obtain the property without paying for it. By a counterclaim, Earnhart, Jr. sought $5,000 actual and $10,000 punitive damages for Dillard's allegedly wrongful scheme to obtain the property without paying for it. The Earnharts, Sr., by counterclaim, sought a decree adjudging plaintiffs' interest in the property subject to the deed of trust.

The trial court denied relief on both counts of plaintiffs' petition. It declared plaintiffs' interest in the property subject to the deed of trust. Otherwise relief sought by counterclaims was denied. Only plaintiffs have appealed.

On this appeal, appellants contend that the trial court's refusal to set aside the deed of trust was erroneous because "plaintiffs

conclusively proved, and defendants admitted that defendant Clyde Lewis Earnhart, Jr. offered to sell said lands to plaintiff free and clear of all encumbrances, and in order to induce plaintiff to purchase said lands, defendants represented that the deed of trust would be released of record and plaintiff would receive title to said lands free and clear of all encumbrances and that plaintiff relied thereon, paid valuable consideration therefor, and defendants refused to release said deed of trust." According to appellants' brief, "The misrepresentations relied on by plaintiffs * * * constitute statements of existing facts or present state of mind and are not merely promissory in nature and [are], therefore, actionable."

■ This is not a case of misrepresentation of the title of the grantor, such as was involved in the cases of Patzman v. Howey, 340 Mo. 11, 100 S.W.2d 851, 856 [6, 7], and Nixon v. Franklin, Mo.Sup., 289 S.W.2d 82, 88–89 [9], [10, 11], cited and relied upon by appellants. The existence of the deed of trust was called to the attention of the purchaser. He was aware of its existence. Dillard's testimony was that, when he met Earnhart in the Blue Ribbon, Earnhart told him that he wanted Dillard to get a good title, free and clear of the mortgage, and that is why his father had gone to Mount Vernon. Dillard did not testify to any positive representation that the mortgage had been released. Dillard knew as much about the state of the title as Earnhart, Jr. knew at the time of the closing. He chose to go through with the transaction despite the advice of his attorney that the abstract of title should be examined. We find no evidence of any misrepresentation of the existing state of the title and the above cited cases, relied upon by appellants, are not applicable.

If appellants are to have any relief on the grounds of fraud and misrepresentation, they must rely upon the failure of Earnhart, Sr. to carry out his assurance that the deed of trust would be released. Respondents assert that, at the best, plaintiffs' evidence showed only a promise to release the deed of trust which, under cases such as Yerington v. Riss, Mo.Sup., 374 S.W.2d 52, cannot support a claim of fraud.

■ It is not necessary to make a final determination as to whether the assurance that the deed of trust would be released was a "mere promise," not actionable under the rule laid down in Reed v. Cooke, 331 Mo. 507, 55 S.W.2d 275, and followed in Yerington v. Riss, supra, and Godwin v. Dinkler St. Louis Management Corporation, 419 S.W.2d 70, 24 A.L.R.3d 1407, or was an actionable misrepresentation of an existing purpose or state of mind, within the rule applied in Thieman v. Thieman, Mo.Sup., 218 S.W.2d 580, 585 [8]. Obviously, if appellants are to prevail, the statement must fall within the latter category. However, if plaintiffs were to succeed on that theory, they were required to show not merely that the assurance was not fulfilled, but further to show that there was no intention to do so at the time that the assurance was given. The applicable rule is stated in Comment a to § 530, 3 Restatement of Torts, p. 69, as follows:

"A false representation of intention is actionable if the statement is reasonably interpretable as expressing a firm intention and not merely as one of those 'puffing' statements which are so frequent in negotiations for a commercial transaction as to make it unjustifiable for the recipient to rely upon them. * * * On the other hand, one who acts in justifiable reliance upon another's honest statement of his then existing intention cannot maintain an action for the loss caused by the disappointment of his expectations if the other for any reason, good or bad, changes his mind and fails or refuses to carry his expressed intention into effect. If the recipient wishes to obtain legal assurance that the intention honestly entertained will be carried out, he must see that it is expressed in the form of an enforceable contract."

Comment c to said section, p. 70:

"c. *Proof of intention not to perform agreement.* The intention which is necessary to make the rule stated in this Section applicable is the intention of the promisor when the agreement was entered into. The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. Such intention may be shown by any other evidence which sufficiently indicates its existence as, for example, the certainty that he would not be in funds to carry out his promise."

■ Here there was a complete failure of proof that Earnhart, Sr. had no intention to release the deed of trust when he assured Dillard that he would do so. On the contrary, all of the evidence was that he actually intended to do so and acted to carry out such intention, failing because he was unable to produce the note secured by the deed of trust, as required by § 443.060, RSMo 1959, VA.M.S. Dillard himself introduced such evidence by his testimony that when he went to the Recorder's Office to record his deed, the recorder informed him that the deed of trust had not been released because Mr. Earnhart had not produced the proper papers. That he thereafter refused to release the deed of trust is not evidence that he never intended to release the instrument. Restatement, supra, 37 Am.Jur.2d, Fraud and Deceit, § 64, p. 100.

The trial court correctly refused to cancel the note and deed of trust.

■ Plaintiff Dillard alternatively sought damages against Earnhart, Jr. for breach of covenant against encumbrances in the deed. The deed was a warranty deed with an express covenant against encumbrances. The respondent suggests that the grantee's knowledge of the outstanding deed of trust would evidence an intention that the covenant not apply to the deed of trust. Such a possibility was suggested in the case of Swink v. Swink, Mo.Sup., 367 S.W.2d 575, 579 [5]. However, we find no circumstance other than such knowledge which would lead to that conclusion. Since the parties to the deed contemplated the removal of the deed of trust, we find no reason to conclude that the warranty was not intended to apply to it.

■ Respondents further urge that the trial court correctly denied the claim for damages for the reason that plaintiffs had not shown that they had been evicted, that they had acquired or extinguished the encumbrances and that they had been damaged to the extent thereof. The cases of Hunt v. Marsh, 80 Mo. 396, 398, and Crosby v. Evans, Mo.App., 195 S.W. 514, 516 [5], fix these matters as prerequisites to any claim for substantial damages for breach of covenant against encumbrances. However, the existence of the outstanding deed of trust did constitute a technical breach of the covenant, entitling the grantee to recover nominal damages. Clough v. Securities Reserve Corporation, Mo.App., 153 S.W.2d 93, 97 [2]; Brand, et al. v. Hough, Mo.App., 206 S.W. 425; 20 Am. Jur.2d, Covenants, § 138, pp. 695–696.

By virtue of Civil Rule 83.13(c), V.A. M.R., this court is authorized to give such judgment as the trial court ought to have given. We, therefore, reverse and set aside the judgment against plaintiffs Dillard and in favor of defendant Earnhart, Jr. on Count II of plaintiffs' petition, and direct the entry of a new judgment, in favor of plaintiffs Dillard and against defendant Clyde Earnhart, Jr., on Count II of plaintiffs' petition, with damages in the sum of $1.00. One half of the costs of the action shall be assessed against plaintiffs and one half against defendant Clyde Earnhart, Jr. Otherwise the judgment and decree of the trial court is affirmed.

Affirmed in part, reversed and remanded in part, with directions.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.