418 F.Supp. 83 (1976)
CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Plaintiff,
v.
TELESWITCHER CORPORATION et al., Defendants.
No. 74-633C(3).
United States District Court, E. D. Missouri, E. D.
July 6, 1976.
*84 Thompson & Mitchell, St. Louis, Mo., for plaintiff.
Bernard Barken, St. Louis, Mo., for Astrodata, Inc. and Teleswitcher Corp.
Robert S. Allen, St. Louis, Mo., for U. C. Leasing, Inc.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a trial to the Court sitting without a jury.
This is a civil action brought by the plaintiff in which it is alleged that the plaintiff was induced to enter into two contracts and a lease regarding a communications system for the plaintiff's commodity brokerage house as a result of misrepresentations made by the defendant, Teleswitcher Corporation (hereinafter referred to as Teleswitcher), who allegedly at all relevant times was acting as the alter ego or agent of defendants Astrodata, Inc. and U. C. Leasing, Inc. (hereinafter Astrodata and U. C.). Rescission of the two leases and damages are sought in Count I; Count II seeks actual and punitive damages for alleged fraudulent representations made by the defendants; Count III seeks rescission of the second contract entered into with respect to the portion of the telecommunications system known as Phase II; Count IV prays for damages as a result of the failure to complete installation of the telecommunications system.
The Court being fully advised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. During the Spring of 1972, until approximately the 26th day of October, 1972, Myron Grills, a Vice-President of the plaintiff, discussed with representatives of Teleswitcher the possibility of providing plaintiff with a communications system which could be integrated with the data processing system of the plaintiff, as well as provide for expanded capacity.
2. Teleswitcher represented to the plaintiff that it could design a system such as described above and install it in two phases. Phase I was to be a piece of equipment *85 similar to that presently used by the plaintiff but with larger capacity. Phase II was to be a back-up system to Phase I, and would also contain the necessary hardware to integrate the communications system with the plaintiff's data processing system.
3. Teleswitcher submitted on October 26, 1972, its proposal to plaintiff with respect to the design, manufacture and installation of Phase I of the system.
4. This proposal of Teleswitcher for Phase I was accepted by the plaintiff on November 3, 1972.
5. The Teleswitcher Phase I computer was installed on the plaintiff's premises on or about March 19, 1973. On that date the plaintiff entered into a leasing agreement with defendant U. C. Leasing, whereby U. C. Leasing, Inc., leased the equipment representing Phase I of the system to plaintiff for a period of thirty six (36) months at a monthly rental of Three Thousand Five Hundred and Thirty-Four Dollars ($3,534.00) per month plus One Hundred and Forty-One Dollars and Thirty-Six Cents ($141.36) per month for taxes.
6. The plaintiff and Teleswitcher entered into a written agreement with respect to Phase II of the communications system on or about May 18, 1973.
7. A meeting was held at the offices of plaintiff between Myron Grills, William Hewitt and Dan Beckham, both of whom were officers and employees of Teleswitcher, on May 15, 1973. At that meeting it was represented to Myron Grills that Phase II of the system would be installed and operating on the plaintiff's premises within thirty to forty-five (30-45) days subsequent to the date of the meeting.
8. Prior to that meeting it had been represented to Myron Grills by other representatives of Teleswitcher that the redundant system of Phase II could be delivered shortly after installation of Phase I.
9. The evidence at trial indicates that plaintiff would not have executed the contract and lease agreement with regard to Phase I of the system had it been aware of the fact that Phase II could not be delivered as stated by the defendant Teleswitcher's agents.
10. The Agreement of May 18, 1973, between plaintiff and Teleswitcher provided that the plaintiff would rent Phase II of the system for a period of three (3) years at a monthly rental of Three Thousand Four Hundred and Eighty-Seven Dollars ($3,487.00).
11. The promised delivery date of forty-five (45) days subsequent to May 15, 1973, was not performed by Teleswitcher.
12. After May 15, 1973, Teleswitcher represented to plaintiff that Phase II of the system would be delivered on November 5, 1973.
13. Teleswitcher failed to meet the delivery date of November 5, 1973. At that time Myron Grills communicated to Teleswitcher his concern that the two delivery dates had not been met.
14. As a result of Mr. Grills' communication to Teleswitcher, a meeting was held in Dallas, Texas, in November, 1973, between Myron Grills and various representatives of Teleswitcher and Astrodata. At that meeting it was represented by Richard Danson, an employee of Astrodata, that prior to the time of the acquisition of Teleswitcher by Astrodata in 1973, Teleswitcher had been promising unrealistic delivery dates to various customers and that such delivery dates could not be met by Teleswitcher.
15. At the Dallas meeting, Myron Grills was provided with a "performance monitor chart" prepared by Teleswitcher showing a new delivery date for Phase II of the system as March 17, 1974. At that time Teleswitcher asserted that it would furnish plaintiff with additional "performance monitor charts" weekly to keep plaintiff apprised of the progress being made with respect to the manufacture and programing of Phase II.
16. Only one additional "performance monitor chart" was supplied to plaintiff by Teleswitcher showing a delivery date of March 17, 1974.
17. In February of 1974, the plaintiff, through Myron Grills, was notified by Lynn *86 Martin, an employee of Teleswitcher, that the March 17, 1974, delivery date could not be met. During the conversation with Mr. Martin, Myron Grills advised Teleswitcher that the plaintiff could not tolerate any further delay with respect to the delivery of Phase II and that the plaintiff would have to look elsewhere for its communication needs.
18. Plaintiff was advised by Teleswitcher through an undated letter that Teleswitcher was discontinuing the manufacture of communications equipment effective March 15, 1974.
19. There was evidence adduced at trial to indicate that for a significant period prior to January of 1974, defendants, Teleswitcher, Astrodata and U. C. Leasing, were aware of the fact that the communications system contracted with for plaintiff Clayton Brokerage would never be delivered, nor would any part of the contract be performed.
20. The evidence at trial also shows that the defendants neglected the manufacture and installation of Phase II of the system, so that a larger contract with a trucking concern could be performed.
21. After receipt of the letter of Teleswitcher regarding the discontinuing of manufacturing of communications equipment, the plaintiff began negotiations with Honeywell, Inc. to obtain a communications system to replace the incomplete Teleswitcher system. An agreement was reached with Honeywell on approximately March 21, 1974, and on April 1, 1974, a lease agreement was executed between the plaintiff and Honeywell, Inc., whereby Honeywell agreed to supply plaintiff with a communications system to replace Phase I and Phase II of the proposed Teleswitcher system.
22. Until the installation of the Honeywell communications system, the plaintiff continued to use Phase I of the Teleswitcher system and continued to pay rent to U. C. Leasing, Inc., pursuant to the lease agreement of March 19, 1973, until October, 1974.
23. Prior to the acquisition of Teleswitcher by Astrodata, Inc., both Teleswitcher and U. C. Leasing were wholly-owned subsidiaries of Union Service Industries, Inc., who controlled the business policies of both U. C. Leasing and Teleswitcher. Teleswitcher acted as an agent for U. C. Leasing in the procurement of leases for U. C. Leasing, Inc.
24. From the date of its initial control of Teleswitcher, until the present time, Astrodata and its officers, directors, agents and employees, directed the business policies of Teleswitcher and controlled its day-to-day operations.
25. In addition, Astrodata provided the necessary funds to pay the salaries of employees of Teleswitcher and to maintain Teleswitcher in business.
26. The evidence is clear that Teleswitcher was the alter ego and business conduit of defendants Astrodata and U. C. Leasing.
27. It is clear that throughout the term of the contract that Teleswitcher failed to provide software services promised by it in its maintenance contract with the plaintiff, in that there was a misalignment in plaintiff's Chicago circuit which caused delays in transmission of buy and sell orders from plaintiff's office in St. Louis to the trading floor in Chicago. As a result of these delays, plaintiff paid to its customers the sum of Thirteen Thousand Six Hundred and Twenty-Eight Dollars and Thirteen Cents ($13,628.13) in payment of claims made by customers against plaintiff as a result of the delay in transmission of buy and sell orders over the Teleswitcher Phase I system.
28. Due to the failure of Teleswitcher to produce the communications system contracted for, the plaintiff was forced to contract with Honeywell, Inc. for such a system. The cost of plaintiff of acquiring the system from Honeywell, Inc. is Forty Thousand Dollars ($40,000) in excess of the amount plaintiff would have been required to pay to defendants pursuant to the lease agreements with respect to Phase I and Phase II of the Teleswitcher system.
*87 29. The plaintiff was damaged due to the breach of defendant Teleswitcher in the amount of Fifty Three Thousand Six Hundred and Twenty-One Dollars and Thirteen Cents ($53,621.13).

Conclusions of Law
The Court has jurisdiction of the parties hereto pursuant to 28 U.S.C. § 1332.
The evidence adduced at trial clearly shows that the various defendants were aware of the impossibility of their performing the various contracted-for services to the plaintiff at the time the promises were made. Such promises to act in the future accompanied by a present intention not to perform clearly state a cause of action for fraud, and for breach of contract. Dillard v. Earnhart, 457 S.W.2d 666, 670 (Mo., 1970); Brennaman v. Andes and Roberts Bros. Const. Co., 506 S.W.2d 462 (Mo. Ct.App., 1973).[*]
Defendants U. C. Leasing and Astrodata, Inc. assert that they cannot be held liable since they are separate corporations. As stated in the findings of fact above, there was evidence adduced at trial which shows that the defendants were merely conduits for each other's operations, and in fact alter egos of each other. The actions of the defendants are in the opinion of the Court, after carefully considering the record, sufficient to pierce the corporate veil and impose liability upon all defendants. Smith v. City of Lee's Summitt, 450 S.W.2d 485 (Mo.Ct. App., 1970).
The defendants have also asserted that the plaintiff waived any possible breaches of the contracts between the parties by acquiescing to the continually setoff delivery dates. There was no evidence adduced at trial to indicate that the plaintiff in any way waived its claims for breach of contract or fraud. It is clear that the plaintiff did not discover the defendants' fraudulent intent until some time in 1973. Accordingly, as stated in the findings of fact, judgment will be entered for the plaintiff in the sum of Fifty Three Thousand Six Hundred and Twenty-Eight Dollars and Thirteen Cents ($53,628.13), the various leases between the parties will be rescinded due to fraud, and the plaintiff shall have judgment against the defendants on all counterclaims.
NOTES
[*] The Court is aware of the recent holding of the Missouri Court of Appeals for the St. Louis District in S. P. Personnel Assocs. etc. v. Hospital B. & E. Co., 525 S.W.2d 345, 349 (1975) where the holding there was that fraud could not be predicated on a mere promise to act in the future even if not accompanied by a present intention not to perform it. It is the opinion of the Court that the decision of the Court of Appeals is inapposite since the controlling holding of the Missouri Supreme Court in Dillard, supra, is not cited.