555 F.2d 1349
 CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Appellee,
v.
TELESWITCHER CORPORATION et al., Appellants.
CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Appellee,
v.
TELESWITCHER CORPORATION, and Astrodata, Incorporated, Appellants.
 Nos. 76-1662, 76-1650.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 17, 1977.
Decided April 6, 1977.
Rehearing and Rehearing En Banc Denied June 28, 1977.
 
 Bernard A. Barken, St. Louis, Mo., for appellants Teleswitcher Corp. and Astrodata, Inc.
 Mark T. Keaney, St. Louis, Mo., for appellant U. C. Leasing, Inc.; Robert S. Allen, St. Louis, Mo., on brief.
 Edwin D. Akers, Jr., St. Louis, Mo., for appellee.
 Before GIBSON, Chief Judge, CLARK, Associate Justice,* and HEANEY, Circuit Judge.
 Mr. Justice CLARK.
 
 
 1
 Clayton Brokerage Company (Clayton) has recovered damages in the sum of $53,628.63 against Teleswitcher Corporation, U. C. Leasing, Inc. and Astrodata, Inc., covering the failure of Teleswitcher to deliver communication equipment according to contract,[1] and the three defendant companies appeal. The questions raised are all factual and we affirm.
 
 
 2
 1. Clayton, a commodities broker headquartered in Clayton, Missouri, with some thirty branch offices, maintained a central communications computer which, among other things, processed orders from its branches to the appropriate exchange for execution. Finding its system inadequate, Clayton entered into a contract with Teleswitcher to lease a new system. Phase I called for a larger computer capacity and a tape drive system[2] to integrate the data processing equipment with that of the communications. Phase II was a back-up system in the event of a Phase I failure.
 
 
 3
 The initial proposal of Teleswitcher related to Phase I only; however, the covering letter represented that Phase II would be installed "in early June, 1973." On November 3, 1972 Clayton formally accepted the Phase I proposal and installation was effected by March 23, 1973. The lease agreement involved three parties: Teleswitcher (the manufacturer), U. C. Leasing, Inc. (the lessor) and Clayton (lessee), and was dated March 19, 1973. The first two parties were wholly owned subsidiaries of Union Service Industries (USI), and the usual business practice involved U. C. Leasing purchasing the necessary equipment from Teleswitcher, thereafter leasing it to a third party, in this case, Clayton. The lease called for payments by Clayton of $3534 per month, plus $141.34 taxes, for 36 months.
 
 
 4
 Phase II of the proposal was dated May 10, 1973 and was signed by Clayton on May 15, 1973. A delivery date, although not stated in the written contract, was set for June 1 to June 15th.[3] On March 23, 1973, Astrodata, Inc. acquired control of all of the stock of Teleswitcher, effective March 29, 1973, and began controlling the latter's day to day operations.
 
 
 5
 Delivery of Phase II was first delayed until "July or August, 1973" and thereafter to November 5, 1973. When the latter date was not met, Clayton dispatched one of its vice-presidents to Teleswitcher's Dallas Office on November 28, 1973, to ascertain the cause of the delay. He was shown progress charts and a new date, March 17, 1974, described as the "absolute latest date," was set for Phase II delivery. Clayton's Vice President testified that he was told "by an Astrodata person (Dick Danson) . . . that Teleswitcher had been selling systems knowing that they couldn't deliver on the two dates given and that Astrodata was in the process of giving definite dates for delivery of all systems." Danson, who was in charge of Teleswitcher's day to day operations from June, 1973, to May, 1974, denied making this comment, but other testimony corroborated the testimony of the Clayton Vice President. After the Dallas meeting, Teleswitcher began laying off employees and by May, 1974, its work force had dropped from 128 to 14 persons, all of which was unknown to Clayton. No work was done on Phase II after February 1, 1974, and during that month, Clayton was informed that the March 17th date could not be met. Clayton advised Teleswitcher that it "could not live with any further delays" and would have to find an alternate system. Shortly thereafter, Clayton received an undated letter from Teleswitcher stating that it was discontinuing the marketing, manufacturing and installing of Teleswitcher equipment as of March 15, 1974. After that date its activity would be limited to the support of its existing maintenance and service agreements.
 
 
 6
 On April 1, 1974, Clayton contracted with Honeywell for a computer system completely replacing that of Teleswitcher and it was installed in July, 1974, at a cost of $40,000 above and beyond that of the entire Teleswitcher system. When the Honeywell system was operational, Clayton returned the Phase I equipment of Teleswitcher to U. C. Leasing, after which it stopped the monthly rental payments. Clayton then brought this suit, alleging that Teleswitcher, acting as agent for Astrodata and U. C. Leasing, fraudulently induced Clayton to enter into the Phase I lease and the Phase II contract. It sought rescission of both as well as actual and punitive damages. U. C. Leasing counterclaimed for $62,481.12 damages covering the amount it claimed due under Clayton's breach of the Phase I lease, and Teleswitcher counterclaimed for the breach of the Phase II contract. The counterclaims were denied and Clayton was awarded a judgment of $53,628.13 against all of the appellants.
 
 
 7
 2. The appellants first challenge the sufficiency of the evidence on the fraud charge as to Phase II, and assert that even if the charge is true, it was waived by continuing use of their equipment and the payment of lease charges following discovery of the fraud. Teleswitcher and Astrodata challenge the sufficiency of the evidence supporting the finding that Teleswitcher was the agent of Astrodata; and, finally, U. C. Leasing claims that the finding that Teleswitcher acted as its agent and was its alter ego was not supported by substantial evidence.
 
 
 8
 As to the evidentiary claims, our review of the record would not permit us to conclude that the findings of the District Court were clearly erroneous. Metropolitan St. Louis Sewer District v. Zykan, 495 S.W.2d 643, 656 (Mo.1973).
 
 
 9
 (a) The Fraud Charge: Appellants rely on Reed v. Cooke, 331 Mo. 507, 55 S.W.2d 275 (1932), but this reliance is misplaced. The Supreme Court of Missouri has adopted Comment a to Section 530, 3 Restatement of Torts. See Dillard v. Earnhart, 457 S.W.2d 666 (Mo.1970). This section, as adopted in Dillard, provides:
 
 
 10
 A false representation of intention is actionable if the statement is reasonably interpretable as expressing a firm intention and not merely as one of those "puffing" statements which are so frequent in negotiations for a commercial transaction as to make it unjustifiable for the recipient to rely upon them.
 
 
 11
 457 S.W.2d at 670.
 
 
 12
 The record clearly reflects specific delays on at least four different occasions consuming some nine months' time prior to Clayton's approach to Honeywell. Rather than mere "puffing", the several false statements made by its officials as to the ability of Teleswitcher to deliver as represented amply support the fraud charge.
 
 
 13
 (b) The Waiver Claims: Nor is there any more merit in the waiver claim. The Supreme Court of Missouri has repeatedly held that there is no waiver through continued use after discovery of the fraud, where the lessee has no other viable alternative. Smith v. Tracy, 372 S.W.2d 925 (Mo.1963); Meyer v. Brown, 312 S.W.2d 158 (Mo.App.1958).
 
 
 14
 (c) Other Evidentiary Claims: Likewise, Astrodata's challenge to the sufficiency of the evidence supporting the finding that Teleswitcher was its agent and alter ego is insupportable. The evidence is overwhelming: Astrodata owned all of the stock of Teleswitcher as of March 29, 1973; it was in complete charge of Teleswitcher's daily operations from the same date; it invested over a million dollars in Teleswitcher attempting to turn its fortunes around; no less than three delivery dates were given Clayton after March 29, 1973, none of which were honored; and, finally, an employee of Astrodata, Danson, advised Clayton that the delivery dates were promised with knowledge that they could not be met. As early as 1942, the Supreme Court of Missouri held in similar factual situations that the courts will ignore separate corporate entities where fraud, wrong or injustice will result. Osler v. Joplin Life Ins. Co., Mo., 164 S.W.2d 295, 298. The same claim as to U. C. Leasing suffers like defects. U. C. Leasing and Teleswitcher were sisters in the U. S. I. corporate family and control over both was interlocked until Teleswitcher's sale to Astrodata. Moreover, even though U. C. Leasing claims that Teleswitcher furnished only five to seven percent of its business during the period involved, the record shows that U. C. Leasing was given the right of first refusal on all leases generated by Teleswitcher as a condition of the sale to Astrodata and in only two instances during its sister relationship with Teleswitcher was U. C. Leasing not the lessor of Teleswitcher equipment leased to its customers. Finally, U. C. Leasing was fully aware that Clayton had contracted for a total communications system, that Phase I had not been completed and Phase II had been neither completed nor delivered.
 
 
 15
 As to the counterclaims, the record fully justifies their demise both for breach of the Phase I lease and the Phase II contract as well as the rescission of the same.
 
 
 16
 The judgment is therefore affirmed.
 
 
 
 *
 Associate Justice Tom C. Clark, United States Supreme Court (Ret.), sitting by designation
 
 
 [1]
 Appellants' counterclaims for breach of contract and breach of lease were denied
 
 
 [2]
 Although a magnetic tape drive was included in the Phase I proposal, "a critical piece of equipment," it was never delivered
 
 
 [3]
 This date was noticed in several documents introduced into evidence that were signed by a Teleswitcher Vice President and corroborated by other testimony