**Christine CRAFT, Plaintiff,**

v.

**METROMEDIA, INC., Defendant.**

No. 83–0007–CV–W–8.

United States District Court,
W.D. Missouri, W.D.

Oct. 31, 1983.

Dennis E. Egan, Sarah W. Hays, Gage & Tucker, Kansas City, Mo., for plaintiff.

Donald W. Giffin, Sandra L. Schermerhorn, Mark P. Johnson, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiff Christine Craft filed her four-count complaint against defendant Metromedia, Inc. on January 5, 1983. Count I alleges that defendant discriminated

against plaintiff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Count II alleges that defendant paid plaintiff less than similarly situated male employees in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Count III alleges that defendant made intentional fraudulent misrepresentations to induce plaintiff to accept employment. Count IV alleges that defendant's actions toward plaintiff, even if lawful, were intended to injure her and therefore constituted a prima facie tort.

Counsel prepared the case on an accelerated discovery schedule, and trial commenced on July 25, 1983. On the eleventh day of trial, a jury of two men and four women reached the following results: On Count I, the jury, sitting only in an advisory capacity under Fed.R.Civ.P. 39(c), found in favor of plaintiff. On Count II, the jury returned a verdict for defendant. On Count III, the jury found in favor of plaintiff and awarded actual damages of $375,000 and punitive damages of $125,000. Count IV was abandoned during trial and was not submitted to the jury.

Three matters are now before the court. First are findings of fact and conclusions of law on plaintiff's claim of sex discrimination. Second is plaintiff's motion for a new trial on her Equal Pay Act claim. Third is defendant's motion for judgment notwithstanding the verdict, new trial, or remittitur on the fraud count.

## I. SEX DISCRIMINATION CLAIM

■ There is no right to a jury trial in discrimination actions filed under Title VII of the Civil Rights Act of 1964. *Harmon v. May Broadcasting Co.,* 583 F.2d 410 (8th Cir.1978). Therefore, with respect to Count I, the jury functioned only in an advisory capacity under Fed.R.Civ.P. 39(c). *See Order of July 22, 1983.* This court is "at liberty to accept or reject the advisory verdict." *Chicago & Northwestern Railway Co. v. Minnesota Transfer Railway Co.,* 371 F.2d 129, 130 (8th Cir.1967). Since the decision of an advisory jury is not binding on the court and presents nothing for appellate

review, it is incumbent upon the court to enter findings of fact and conclusions of law under Fed.R.Civ.P. 52(a), just as if there had been no jury. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2335 (1971).

### A. Findings of Fact

Plaintiff Christine Craft is a female citizen of the United States and is a resident and citizen of California, residing at the time of trial at 3557 Padaro Lane, Carpinteria, California. Defendant Metromedia, Inc. is a Delaware corporation with its headquarters and principal place of business in New Jersey. Its headquarters are located at One Harmon Plaza, Secaucus, New Jersey. Prior to May 18, 1982, defendant was the owner and operator, pursuant to a license issued by the Federal Communications Commission, of KMBC–TV, Channel 9 (hereinafter KMBC), in Kansas City, Missouri. KMBC has been a network affiliate of the American Broadcasting Company (ABC) throughout the relevant period. Plaintiff was employed at KMBC as a staff announcer and performed duties as a co-anchor and reporter from December, 1980, to August 14, 1981. At all times here relevant, R. Kent Replogle was vice president and general manager of KMBC and Ridge Shannon was news director. Replogle was the highest ranking station employee, and Shannon reported directly to him. On May 18, 1982, the assets of KMBC were acquired by the Hearst Corporation, which is not a party to this action.

Plaintiff received a liberal arts degree in English and anthropology from the University of California at Santa Barbara in 1968. Upon graduation, she was first employed for two years as a teacher of emotionally disturbed and retarded children. Thereafter she pursued other interests, particularly surfing, and supported herself with an assortment of part-time jobs. Eventually, plaintiff decided to pursue a career in broadcasting. In mid-1975, she was hired as a weeknight weather reporter at KSBW–TV, a small station in Salinas, California. During her tenure of approximate-

ly one and one-half years, plaintiff worked as an announcer, reporter, and substitute sportscaster, in addition to her job as weather reporter. In late 1976, plaintiff became the weekend weather anchor at KPIX–TV in San Francisco, California, which is the sixth largest television market in the nation. Plaintiff remained at KPIX for one year, and while there she also did some news reporting and substitute sports production and anchoring.

Plaintiff was next hired by CBS as the host of a segment of CBS Sports Spectacular entitled "Women in Sports." As part of this program, plaintiff was involved in summarizing weekly news concerning women's athletics and in producing weekly profiles of women athletes. While at CBS, plaintiff's appearance was altered by network makeup specialists. Her hair was cut short and bleached blonde, and she was required to use black eyebrow pencil and dark red lipstick. Plaintiff voiced objection to this treatment but did not voluntarily leave her employment at CBS because of it. "Women in Sports" was discontinued after thirty weeks. Plaintiff returned to California and engaged in pursuits other than television for about a year.

In mid-1979, plaintiff returned to television as a reporter at KEYT–TV in Santa Barbara, California, which is the 116th largest television market in the nation. Plaintiff also served as weeknight news anchor and occasionally presented sports and weather. Plaintiff resigned her employment at KEYT in December, 1980, to accept employment with defendant at KMBC in Kansas City.

Kansas City is the nation's twenty-seventh largest television market, and KMBC has two main competitors: KCTV (formerly KCMO–TV), Channel 5, the CBS affiliate; and WDAF–TV, Channel 4, the NBC affiliate. From July, 1978, to January 5, 1981, Scott Feldman was the solo anchor on the 6 p.m. and 10 p.m. weekday newscasts at KMBC. For several years prior to Feldman's arrival in 1978, defendant had been the ratings leader in the local television news market, but its ratings had slipped since Feldman's arrival. Research indicated that the decline was due to two factors: the appearance of co-anchors at KMBC's competitors, and a perception among viewers that Feldman lacked warmth, thereby diminishing his professionalism and authoritativeness. Based on that research and the presence of co-anchors at KMBC's competitors, Replogle and Shannon determined that KMBC should adopt a co-anchor format and that, in order to "soften" the image of its news presentation, the co-anchor should be a woman.

In the search for a female co-anchor, Shannon reviewed videotapes of numerous candidates. The Media Associates (later known as Audience Research and Development) of Dallas, Texas, a media consulting firm retained by KMBC, supplied a tape of plaintiff's work in Santa Barbara. Based on his review of many tapes, Shannon contacted several individuals, including plaintiff, to ascertain who was interested in and available to audition for the new co-anchor position. During their first telephone conversation in November of 1980, plaintiff told Shannon she was interested in the position so long as it did not involve a "makeover" of her appearance, such as she had experienced at CBS. Following further discussions, it was agreed that plaintiff would come to Kansas City for an audition, which occurred in late November, 1980. During renewed discussions about the nature of the job and the issue of plaintiff's appearance, Shannon explained the station had consultants who worked with on-air personnel in various areas, including delivery, clothing, and makeup. Plaintiff acknowledged her lack of expertise in matters of makeup and hair and indicated her willingness to work on her appearance with a consultant.

At the conclusion of the interview and audition, plaintiff was offered the position at a salary of $28,000. She returned to California with a copy of defendant's standard contract for personal services. Shannon and Replogle had advised plaintiff to review the contract with her attorney, and plaintiff contacted her friend, Robert Hamilton, an attorney and writer who had previ-

ous experience negotiating contracts for personal services.

In the weeks that followed, Hamilton negotiated with Shannon on behalf of plaintiff, with the following results: First, the term of the contract was reduced from three years to two years. Second, plaintiff's salary was increased to $35,000 during the first year and $38,500 during the second year. Third, the standard provision permitting defendant to terminate the contract at the end of each thirteen-week cycle was deleted; in lieu thereof, defendant retained the right to terminate the contract after twelve, eighteen, and twenty-four months, thereby giving plaintiff greater job security. On the other hand, defendant rejected Hamilton's request that plaintiff's position be specifically described as co-anchor; instead, the standard language describing her position as staff announcer and permitting defendant to reassign her remained in the contract. Defendant also refused to include a clothing allowance in the contract as requested by Hamilton.

Counsel for defendant revised the standard contract to include the modifications described above. Copies of the contract were presented to plaintiff for execution sometime after she commenced her duties at the station; management again suggested the contract should be reviewed by her attorney. After approximately three weeks on the job as co-anchor, plaintiff signed the contract on January 22, 1981, without reading it in detail and without consulting an attorney.

Plaintiff had moved to Kansas City in mid-December 1980. At the direction of Shannon, she traveled via Dallas, Texas, where she stopped and met with Lynn Wilford of the Media Associates. They evaluated plaintiff's abilities and discussed effective news presentation. At the request of Shannon, Wilford kept discussion of plaintiff's appearance to a minimum.

Plaintiff began working at the station in late December, 1980. During a short transitional period, plaintiff did some reporting and promotional work so that viewers would become acquainted with her. It was also necessary for plaintiff to familiarize herself with certain technical aspects of the KMBC news operation. She began as co-anchor on January 5, 1981; to further ease the transition for plaintiff and the viewing audience, Shannon directed the news producer to assign the "lead-in" or first news story of each broadcast to Feldman about two-thirds of the time and to plaintiff about one-third of the time. This allocation continued for a few weeks; thereafter, lead stories were allocated equitably between Feldman and plaintiff.

Soon after plaintiff began her duties as co-anchor, it became apparent to Shannon and Replogle that on several occasions plaintiff's on-air makeup and clothing were inappropriate. Shannon commented to plaintiff several times early in her employment that she should dress more conservatively and use makeup properly. He arranged for Lynn Wilford to come to Kansas City on January 14, 1981, to assist plaintiff in improving her appearance. During this visit, Wilford worked on plaintiff's wardrobe and makeup. In subsequent periodic visits to the station, Wilford continued these efforts, achieving only modest success.

During her initial months of employment, plaintiff had considerable discretion in the selection of her on-air clothing. Although Shannon made occasional suggestions or criticisms as to the appropriateness of certain pieces of clothing, neither he nor any other representative of defendant mandated that plaintiff observe any strict dress code during her first months at the station. Beginning in April, 1981, KMBC arranged for Macy's Department Store to provide clothing for plaintiff in exchange for advertising time. Maureen Shawver, a clothing consultant from Macy's, assisted plaintiff in making clothing selections. In addition, Wilford reviewed videotapes of plaintiff in various outfits. Plaintiff was not ordered to wear any of the clothes selected, and in fact she rejected several items suggested by Shawver.

On May 19 and 20, 1981, Steven Meacham of the Media Associates conducted four fo-

cus group discussions to learn how television viewers perceived KMBC's news program. A focus group is an accepted research technique whereby a small group of individuals with similar demographic characteristics meet to discuss a given subject, in this instance television news in Kansas City. A focus group does not produce scientifically reliable results because of the small statistical sample; however, it may suggest possible trends and areas for further research.

Meacham acted as moderator of the focus group discussions. Many topics were discussed, and the participants reviewed sample videotapes of local news programs. The response to plaintiff, and in particular to her appearance, was overwhelmingly negative. During the course of these discussions, and after the participants' attitude toward plaintiff had become apparent, Meacham on more than one occasion made derogatory remarks about plaintiff. Although his comments may have been indecorous and ill-advised, it is clear from listening to the tapes that they were made after the attitude of the group had been made very clear and they did not influence the opinions held by focus group participants.

Station management observed the focus groups from behind a one-way mirror. Shannon and Replogle met with plaintiff on May 21, 1981, to discuss the results and possible responses. Replogle advised plaintiff that there seemed to be some problems with her acceptance by the Kansas City viewing audience, but he indicated that management was ready to work with her to overcome those problems. Plaintiff at first said she wanted to be let out of her contract so that she could return "home" to California. Replogle reiterated defendant's desire to retain plaintiff's services and to work with her to overcome the negative audience response. Plaintiff eventually agreed to cooperate with defendant in that endeavor. Replogle stated that defendant would be instituting a clothing calendar for plaintiff. She agreed to follow the calendar when she received it. Thereafter, plaintiff's wardrobe was more closely supervised, but the clothing calendar was not formally instituted until late July or early August, a few weeks before plaintiff was removed as co-anchor.

As a follow-up to the focus groups, Media Associates conducted a telephone survey in late June, 1981, of the attitudes of four hundred randomly selected individuals residing in the greater Kansas City viewing area. All persons and organizations involved in the construction, administration, and analysis of the survey were experienced in market and broadcasting research. The survey measured the attitudes of Kansas City television viewers toward a wide range of selected aspects of television news in Kansas City. The questionnaire was drafted by Steven Meacham and revised by station management and included questions on various issues raised by the focus group participants, including plaintiff's dress and appearance. The questionnaire asked questions from both sides of the appearance and dress issues for plaintiff, in an attempt to see if persons surveyed perceived as strengths those qualities which the focus groups perceived as drawbacks. The questionnaire was administered during long-distance telephone interviews by trained employees of Weise, Rozmarin & Associates of Omaha, Nebraska. Weise, Rozmarin used accepted quality control procedures in validating the interviewers' work and the data entered for computer analysis. The data was processed with the commonly used Statistical Program for the Social Sciences and was generated in the form of a computer print-out with indexed tables. Weise, Rozmarin forwarded the data to Media Associates in Dallas. The survey was conducted in accordance with generally accepted principles of survey research, and its results are trustworthy; moreover, defendant's reliance on those results was reasonable and appropriate. Plaintiff's attempt to question the validity of the survey research through the testimony of Thomas Beisecker, an Associate Professor of Communications Studies at the University of Kansas, was not persuasive. He conceded the telephone survey was not sex-biased, and he

lacked credentials and experience in the area of broadcasting research.

Shannon and Replogle received the final results of the June telephone survey on about August 3, 1981. The report concluded that plaintiff was having an extremely adverse impact on defendant's acceptance among Kansas City viewers. In the survey, plaintiff was compared to the female co-anchors at WDAF and KCMO and was found to be the least popular and least accepted of the three in almost every category. Comparisons were made primarily to Anne Peterson, who co-anchored at KMBC's primary competitor, KCMO. In virtually every comparison with Peterson, plaintiff trailed. On August 13, 1981, Shannon and Replogle met with consultants from Media Associates, who recommended that plaintiff be replaced immediately. Shannon and Replogle initially resisted the suggestion, but after discussing the matter in Replogle's office the next morning, Friday, August 14, they agreed to remove plaintiff as co-anchor and to reassign her to the position of general assignment reporter at no loss in pay or other contractual benefits. Shannon decided he would tell plaintiff of the decision to reassign her when she came to work at 2:30 p.m. After finishing his discussion with Replogle, which lasted most of the morning, Shannon went to his office in the newsroom. Shortly thereafter, he encountered plaintiff, who had come to work early to edit a story. Since she would soon be leaving for an interview, Shannon decided to inform her of the reassignment immediately. At his request, plaintiff entered Shannon's office. During the discussion that followed, only the two of them were present and the door to Shannon's office was closed.

Shannon began by reminding plaintiff of their previous discussions about her appearance and on-air stumbling and their attempts to overcome those obstacles. Referring to the recent research, he said that these factors had created a wall between plaintiff and viewers and that she was being removed as co-anchor and reassigned as a general assignment reporter. Plaintiff asked why she was being reassigned, and in response, Shannon turned to a cabinet behind his desk in which he had placed the Media Associates' report. He picked it up and said that the results of the research were devastating and unprecedented in the history of Media Associates. Shannon said that the report proved that the audience perceived plaintiff's dress, appearance, makeup, and presentation as stumbling blocks. Further, Shannon said that the report showed that female viewers were leaving KMBC for its closest competitor, KCMO. Although Shannon told plaintiff that defendant intended to honor its contractual obligation to her, plaintiff said that she was going home to Santa Barbara. Shannon encouraged plaintiff to stay on as a reporter and suggested she take the weekend off to consider the matter. Before leaving Shannon's office, plaintiff indicated that she did not think she would change her mind about leaving. At no time during their discussion on August 14, 1981, did Shannon tell plaintiff she was being reassigned because she was too old, too unattractive, and not deferential enough to men or that she was being reassigned because the audience so perceived her.

Over the weekend, plaintiff discussed her situation with several persons, including her attorney Robert Hamilton and a local newspaper reporter. On the following Monday, August 17, 1981, she sent a telegram to defendant reiterating her decision not to accept a reassignment. During this same period, Hamilton telephoned Shannon several times to urge him to reinstate plaintiff as co-anchor. When Shannon refused, Hamilton on one occasion lost his temper and threatened to make the matter a "cause celebre." A meeting on Tuesday, August 18, 1981, between plaintiff, Shannon, and Replogle at the Kansas City Club, called by defendant in an attempt to resolve the matter amicably, ended in an impasse.

When Shannon arrived at work on Monday, August 24, 1981, he found the clothes defendant had bought for plaintiff on the couch in his office and plaintiff's key to the station on his desk. Plaintiff appeared at the station about 8:45 a.m. that morning

and informed Shannon she was reporting to work as a co-anchor. He responded that she could work as a reporter. Plaintiff said "good-bye" and left, returned to her apartment, and drove to Santa Barbara, California, a few days later. On September 1, 1981, plaintiff commenced work as co-anchor at KEYT in Santa Barbara, a job she still held at the time of trial.

KMBC management was concerned about the appearance of all its on-air personnel, both male and female. Management expected grooming and dress to be consistent with community standards; on-air personnel understood the need to maintain a professional and business-like appearance. Whenever an appearance problem was detected, management responded with measures appropriate to the individual situation. Plaintiff received counseling in clothing and makeup, areas in which she acknowledged her lack of expertise. When it later became apparent that additional measures were needed to correct the problems, clothing was acquired from Macy's and a clothing calendar was instituted.

Pam Whiting, the weekend co-anchor during most of the time plaintiff was weeknight co-anchor, is another example of management's individualized response to appearance problems. Like plaintiff, Whiting, whose prior employment was limited to radio, was inexperienced in the use of appropriate television makeup; therefore, consultants were used to educate her in makeup techniques. Clothing was also an occasional problem, but the circumstances did not warrant a clothing calendar or routine purchase of clothing for Whiting. Unlike plaintiff, Whiting also had problems with her weight and her hairstyle; therefore, individualized analysis and recommendations were made in those areas.

Brenda Williams has been employed at KMBC since 1977 in various positions, including weekend anchor and reporter, and Williams was selected to replace plaintiff as weeknight co-anchor in September, 1981. Williams' appearance was always satisfactory to defendant, and no corrective measures were ever necessary.

Defendant also gave individualized attention to the appearance of male on-air personnel. The appearance of co-anchor Scott Feldman was generally satisfactory; however, on at least two occasions, he received specific directives regarding his choice of shirts. Shannon and Wilford told Mike Placke, the weekend weatherman, to lose weight and improve his wardrobe; he followed those suggestions. Wilford suggested that Bob Werley, a reporter, blow dry his hair, try contact lenses, and change his on-air makeup. Werley took the advice although he discovered that he could not wear contact lenses, so he changed his makeup to improve his appearance with glasses. Michael Mahoney, a reporter, was told that he needed to lose weight and improve his wardrobe; he did so. In addition, Mahoney occasionally experienced a nervous twitch in his mouth, which resembled a sneer. Management attempted to assist him in overcoming this problem. Shannon told Tim Richardson, a noon newscaster and reporter, to change his hairstyle; Richardson complied.

Newsroom operations were conducted without regard to sex, consistent with defendant's policy of equal co-anchors. After the first few weeks of plaintiff's performance as co-anchor, lead-in stories were equitably distributed between plaintiff and her co-anchor, Scott Feldman. Other job assignments which plaintiff considered desirable, including on-site reporting and "hard" news stories, were also equitably distributed, as were less desirable duties such as "news teases" (short promotional segments taped at about 4 p.m.), to the extent possible given the exigencies of the newsroom. On one occasion, in March, 1981, Shannon reprimanded Feldman for referring to plaintiff as "that girl," telling Feldman that such conduct would not be tolerated. As plaintiff testified, "Ridge reprimanded Scott for using that type of language and told both of us we were co-equal, we were co-anchors and he would not tolerate that sort of language."

Although Feldman was paid more than plaintiff, the differential was based on fac-

tors other than sex. Feldman had an education in broadcasting, several years of experience as a news anchor in major television markets prior to coming to Kansas City in 1978, and was well established in the Kansas City market by the time plaintiff arrived in 1981. On the other hand, plaintiff had no formal education in broadcasting, her experience as a news anchor was limited to small television markets, and she was unknown to Kansas City viewers.

Ratings, or measurements of the size of the viewing audience, are very important in the television industry because they have a direct effect on a station's advertising revenue. Two private companies, Arbitron and Nielsen, issue ratings several times a year. Ratings measure audience behavior by ascertaining the number of persons actually tuned to a given station. In contrast, audience research, such as that conducted by Media Associates, measures attitudes in an attempt to explain and forecast the ratings. Audience research enables station management to adjust its programming to increase, or at least to maintain, its share of the audience.

The results of the audience research have been previously summarized. In addition, both parties introduced considerable evidence on KMBC's ratings before, during, and after plaintiff's tenure at the station. This evidence was equivocal at best and is of no particular assistance to the court in resolving the issues raised under Title VII since defendant removed plaintiff as co-anchor based on research showing negative viewer attitudes toward plaintiff which could be expected to result in an eventual erosion of defendant's ratings. The July, 1981, ratings were unavailable and unknown to defendant when plaintiff was removed as co-anchor; therefore, whether those ratings ultimately went up or down is simply irrelevant to the issue of sex discrimination. Even assuming the ratings improved during and immediately after plaintiff's tenure, that would simply mean that defendant and its consultants erred in their predictions, and such evidence would not support an inference of sex discrimination.

In summary, plaintiff was not discriminated against because of her sex. The measures taken by defendant with respect to her appearance were necessary and appropriate considering her individual shortcomings. Plaintiff's salary was determined on the basis of factors other than sex. Plaintiff was not constructively discharged since defendant did not render her working conditions intolerable, and they were not, in fact, intolerable. Plaintiff voluntarily resigned rather than accept a reassignment pursuant to the terms of her contract. Accordingly, she suffered no damages attributable to any wrongful act of defendant.

### B. Conclusions of Law

Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b). The court has jurisdiction over the parties and subject matter jurisdiction of this action under 28 U.S.C. § 1343(a)(4) and 42 U.S.C. § 2000e–5(f)(1).

42 U.S.C. § 2000e–(2)(a) provides in part that it shall be an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."

Plaintiff makes essentially three claims of sex discrimination. She first asserts discrimination in the terms and conditions of her employment; specifically, she complains that she was subjected to a rigorous dress code and constant criticism of her appearance while her male counterparts received no such treatment. Plaintiff's second complaint of sex discrimination concerns her removal as co-anchor; she claims that defendant's explicit and implicit reasons for removing her were based on sex and that defendant's actions amounted to a constructive discharge. Finally, plaintiff asserts that she was paid less than Scott Feldman because of her sex. With respect to all of her claims under Title VII, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

▮ Plaintiff's first claim of sex discrimination based on defendant's actions with respect to her appearance must be analyzed both in terms of theory and practice. To the extent that plaintiff might argue that Title VII absolutely prohibits an employer from imposing reasonable but different standards of appearance for males and females, such a position must be rejected as contrary to the overwhelming weight of authority. Title VII "was never intended to interfere in the promulgation and enforcement of personal appearance regulations by private employers." *Knott v. Missouri Pacific Railroad Co.,* 527 F.2d 1249, 1251–52 (8th Cir.1975). "[A] private employer may require male employees to adhere to different modes of dress and grooming than those required of female employees and such does not constitute an unfair employment practice within the meaning of 42 U.S.C. § 2000e–2(a)." *Baker v. California Land Title Co.,* 507 F.2d 895, 898 (9th Cir.1974), *cert. denied,* 422 U.S. 1046, 95 S.Ct. 2664, 45 L.Ed.2d 699 (1975). *See also Fountain v. Safeway Stores, Inc.,* 555 F.2d 753, 755–56 (9th Cir.1977) (citing cases).

The courts which have considered this issue have taken a realistic and common-sense approach. For instance, in *Fagan v. National Cash Register Co.,* 481 F.2d 1115 (D.C.Cir.1973), the court stated:

Perhaps no facet of business life is more important than a company's place in public estimation. That the image created by its employees dealing with the public when on company assignment affects its relations is so well known that we may take judicial notice of an employer's proper desire to achieve favorable acceptance. Good grooming regulations reflect a company's policy in our highly competitive business environment. Reasonable requirements in furtherance of that policy

are an aspect of managerial responsibility.[1]

*Id.* at 1124–25. Judge Collinson of this district has taken a similar approach:

Employment decisions ... based on either dress codes or policies regarding hair length are more closely related to the company's choice of how to run its business rather than to its obligation to provide equal employment opportunities. The decision to project a certain image as one aspect of company policy is the employer's prerogative which employees may accept or reject. If they choose to reject the policy, they are subject to such sanctions as deemed appropriate by the company. An employer is simply not required to account for personal preferences with respect to dress and grooming standards.

*Lanigan v. Bartlett & Co. Grain,* 466 F.Supp. 1388, 1392 (W.D.Mo.1979). *See also Willingham v. Macon Telegraph Publishing Co.,* 507 F.2d 1084, 1091 (5th Cir.1975) (en banc).

▮ Thus, defendant's standards of appearance for its on-air personnel can in no way be considered discriminatory per se. Both men and women were required to maintain a professional, business-like appearance consistent with community standards. Since television is a visual medium, as plaintiff admitted in her testimony, such a reasonable requirement is obviously critical to defendant's economic well-being.

Plaintiff's claim of sex discrimination is also based on defendant's standards of appearance as applied. She contends that defendant routinely and rigorously enforced dress and makeup requirements for women but not for men. This court recognizes that otherwise permissible appearance and grooming standards could be unlawful if invidiously applied. *See Knott,* 527 F.2d at 1252 (upholding validity of reasonable grooming and appearance standards when "imposed in an evenhanded manner on all employees"). Ultimately the issue is a mat-

---

1. It is well recognized that Title VII "was not intended to 'diminish traditional management prerogatives.'" *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096.

ter of proof, and the evidence fails to sustain plaintiff's position.

An individual's appearance is a unique and often sensitive matter. Television by its nature requires station management to exercise special supervision over matters of personal appearance, yet it was apparent at trial that KMBC management found it preferable and politic to permit on-air personnel to operate within rather general appearance guidelines to the extent feasible considering the skill and judgment of each employee. Many employees, both male and female, demonstrated a fairly consistent ability to maintain their appearance at a level acceptable to management; therefore, little or no supervision or criticism was necessary. Other employees, also of both sexes, had more difficulty maintaining their appearance. Plaintiff was one of these; therefore, management found it necessary to offer criticism, advice, and assistance, tailored to fit her individual needs.

■ In plaintiff's particular case, management had to contend with several factors. First was plaintiff's highly visible role as co-anchor, which meant that the fortunes of KMBC were linked to the impression plaintiff left with viewers. Second was plaintiff's below-average aptitude in matters of clothing and makeup. Third was plaintiff's attitude that her appearance was not critical to her success as an anchor, an attitude directly opposite to that of management. The final factor was plaintiff's acute sensitivity to management's efforts to improve her appearance. Faced with this unique and difficult situation, management responded cautiously and gradually. With the assistance of consultants, defendant first attempted to teach plaintiff the necessary skills in makeup and clothing. When this diplomatic approach proved ineffective, the next step was to acquire clothing for plaintiff and to suggest how it should be worn. Finally, management found it necessary to implement a clothing calendar and to monitor plaintiff's appearance closely.

Defendant's responses to the appearance problems of other employees, both male and female, do not support an inference of discrimination. If anything, that evidence shows a consistent concern by management over the appearance of all on-air personnel without regard to sex but with regard to the peculiar characteristics of each employee. Plaintiff was an employee of atypical aptitudes and attitudes, and defendant merely acted to correct appearance problems which plaintiff was unable or unwilling to remedy. The actions taken by defendant in regard to plaintiff's appearance were not the result of any general animus toward women or of any specific animus toward plaintiff as a woman. It may well be that in plaintiff's case some of the steps taken by management were unprecedented, but they were not ipso facto discriminatory.

Plaintiff's second claim of sex discrimination concerns her removal as co-anchor. Insofar as this claim is based on the much-publicized litany—"too old, too unattractive, and not deferential enough to men"— allegedly uttered by Shannon on August 14, 1981, it is rejected since this court has concluded as a matter of fact that Shannon said no such thing.

■ Plaintiff also contends that discrimination can be inferred from the circumstances surrounding her removal as co-anchor; however, she has not sustained her burden of proof on this contention. Defendant's reliance on the results of the telephone survey conducted by Media Associates was not pretextual and was in fact the reason plaintiff was reassigned. The survey was a routine procedure designed to evaluate many facets of the KMBC news operation and was conducted, tabulated, and evaluated by persons experienced in the field of broadcast research. There is simply no evidence that the survey was designed to effect the removal of plaintiff as co-anchor because of her sex or any other reason: even plaintiff's expert conceded the survey was not sex-biased. Under these circumstances, defendant was entitled to rely on the results of the survey.

Plaintiff suggests an inference of sexual animus can be drawn by contrasting the consultant's report to the ratings from the same period; however, even assuming the

ratings unequivocally showed KMBC to be in first place just prior to plaintiff's removal as co-anchor, a more plausible inference is that television research is an inexact science. It might also be argued broadly that defendant should not have relied on the consultant's report as a basis for removing plaintiff as co-anchor, but this is a normative issue not properly before the court under Title VII:

> The news business may indeed have its quirks and vagaries, in this age when the selection of a new anchor for the CBS evening news is itself front-page news, but consultant's reports and ratings routinely serve as the basis for personnel changes. Furthermore, the ratings and the report provided strong evidence in support of the defendant's decision.

*Haines v. Knight-Ridder Broadcasting, Inc.,* 25 Empl.Prac.Dec. (CCH) ¶ 31,650 (D.R.I. July 3, 1980).

As part of the claim arising out of her removal as co-anchor, plaintiff also contends that she was constructively discharged because of her sex. This contention is untenable on both the law and the facts. "Generally, a constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir.1982). "To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981). Here the evidence does not support a finding that plaintiff's working conditions became so intolerable that she had no choice but to quit; moreover, there is no evidence that any of the actions by defendant were taken with the intent to force plaintiff's resignation. On the contrary, it appears that defendant repeatedly expressed its desire to retain plaintiff first as co-anchor and later as a reporter.

Plaintiff's last claim under Title VII is simply a reprise of her Equal Pay Act claim. The jury found against her on that claim, and elsewhere this court has refused to disturb that finding. *See* Section II, *infra.* It would therefore be entirely inappropriate to reconsider the matter under Title VII since the jury found the defendant had established a defense under the Equal Pay Act. *See Orahood v. Board of Trustees,* 645 F.2d 651, 654 n. 3 (8th Cir. 1981) ("a defendant who establishes one of [the four affirmative defenses in the Equal Pay Act] cannot be held liable under either Title VII or the Equal Pay Act"). Even assuming plaintiff's pay claim could now be considered under Title VII, the evidence demonstrated that the difference in pay between plaintiff and Scott Feldman was attributable to several factors other than sex, particularly education and experience.

In summary, defendant's actions toward plaintiff during her employment at KMBC were not based on her sex—with one notable and ironic exception: but for the fact that she is a female, plaintiff would not have been hired as a co-anchor in December, 1980, regardless of her other abilities. Thereafter, defendant's treatment of plaintiff was the result of factors other than sex. Her salary was less than that of Scott Feldman not because she was a woman but because her education and experience were not commensurate with his. She was a "co-equal co-anchor," and newsroom operations were conducted without regard to sex. Her affinity for the casual beach life and her apparent indifference to matters of appearance required defendant to formulate and implement corrective measures appropriate to her unique circumstances. Defendant reassigned plaintiff because properly conducted audience research demonstrated unprecedented negative viewer response toward her. She was not constructively discharged; rather, she voluntarily left KMBC rather than abide by the terms of a contract which she had signed but never carefully reviewed.

## II.  EQUAL PAY ACT CLAIM

The jury returned a verdict for defendant under Count II, the Equal Pay Act claim, and plaintiff has moved for a new trial.

A review of the suggestions filed in support of the motion fails to convince the court that the verdict on Count II should be disturbed. Contrary to plaintiff's assertion, the verdict was not against the clear weight of the evidence. Plaintiff's allegations of instructional error on Count II are not well taken. Finally, the court adheres to its previous rulings on the admission and exclusion of evidence concerning the compensation of other KMBC employees.

## III. FRAUD CLAIM

On plaintiff's claim of fraud under Count III, the jury awarded actual damages of $375,000 and punitive damages of $125,000. Defendant now seeks judgment notwithstanding the verdict or a new trial or remittitur. Defendant has filed extensive suggestions in support of its motion, and plaintiff has responded in kind.

At the outset, it is apparent that the motion for judgment notwithstanding the verdict should be denied. Technically, it is merely a renewal of the motion for directed verdict made at the close of all the evidence. *Johnson v. Rogers,* 621 F.2d 300, 305 (8th Cir.1980). In this case, the motion for directed verdict was denied after extensive post-trial briefing and argument. *Order of August 31, 1983.* A motion for judgment notwithstanding the verdict "can be granted only if the motion for directed verdict should have been granted." *Walker v. KFC Corp.,* 515 F.Supp. 612, 615 (S.D.Cal. 1981). Defendant has not convinced this court that a directed verdict should have been granted; therefore, the motion for judgment notwithstanding the verdict will be denied.

This court has greater latitude in considering defendant's alternative motion for a new trial: "Rule 59 gives the trial judge ample power to prevent what he considers to be a miscarriage of justice. It is his right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2803 (1973). A new trial may be ordered for a great variety of reasons:

It has been said that the general grounds for a new trial are that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions.

*Id.* § 2805. *See also Fireman's Fund Insurance Co. v. Aalco Wrecking Co.,* 466 F.2d 179, 187 (8th Cir.1972) (court may order new trial if first trial resulted in a miscarriage of justice), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). "[W]here the trial court finds the verdict contrary to the weight of the evidence and grants a new trial ... the appellate court should 'exercise a closer degree of scrutiny and supervision ... in order to protect the litigants' right to jury trial.'" *Id.,* 466 F.2d at 187 (quoting *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3rd Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). On the other hand:

When evidence is erroneously admitted or excluded or where the trial court has erred in the instructions to the jury, the trial court is considered in a better position to correct a manifest injustice in ruling on the motion for new trial. Under these circumstances the grant of the new trial does not interfere with the role of the jury as the trier of fact.

*Fireman's Fund,* 466 F.2d at 186. The trial court is also in the best position to determine whether the verdict is excessive; it is the opinion of the Eighth Circuit that

inadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders; and that we shall continue to consider review, as we have said before, not routinely and in every case, but only in those rare situa-

tions where we are pressed to conclude that there is a "plain injustice" or a "monstrous" or "shocking" result. *Nodak Oil Co. v. Mobil Oil Corp.*, 533 F.2d 401, 410 (8th Cir.1976) (quoting *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447–48 (8th Cir.), *cert. denied*, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961)).

The jury awarded plaintiff $375,000 in actual damages and $125,000 in punitive damages. The court is firmly convinced that this verdict is excessive and is the result of passion, prejudice, confusion, or mistake on the part of the jury. It is telling to note that plaintiff prayed for $200,000 in actual damages in her complaint and her counsel asked for $75,000 to $100,000 in actual damages in closing argument, yet the jury awarded $375,000. Although the award of punitive damages was within the amount specified in the prayer and closing argument, the jury's unprincipled award of actual damages makes the award of punitive damages inherently suspect.

Instructional errors may be in part responsible for the excessive award. Prior to trial, the court announced that the issue of punitive damages would be submitted, if at all, only after a finding of liability. The goal of this bifurcated procedure was to focus the jury's attention first on the question of liability in order to promote a more reasoned analysis of the case. Unfortunately, the issue of punitive damages was not expressly withdrawn from the jury when the case was first submitted, and it is apparent that the award of "compensatory" damages contains a substantial, but undefined, punitive element. On retrial, the submission of damages will again be bifurcated; however, the issue of punitive damages will be expressly withdrawn from the jury during its initial deliberations to eliminate the risk of jury confusion or mistake.

Another instructional shortcoming concerns the issue of wrongful discharge. In a case such as this, it is important that the jury not be given a roving commission to second-guess defendant's managerial decisions. Defendant submitted a proposed instruction to withdraw from the jury any consideration of the general fairness or reasonableness of defendant's actions toward plaintiff. Although the court was amenable to such an instruction in theory, defendant's proposal was unsatisfactory as were attempts to revise it. The proposed instruction was also rejected in favor of Instruction No. 12, which expressly withdrew wrongful discharge and related issues from the jury under Count I. However, a review of the instructions as a whole now convinces the court that wrongful discharge and related issues were not clearly withdrawn from the jury's consideration, particularly with respect to Count III. It is therefore quite possible that the jury was confused or mistaken as to the applicable law, and a new trial is appropriate.

In addition to the mistake and confusion possibly created by the instructions, the excessive verdict is also certainly attributable to passion and prejudice caused by the pervasive publicity surrounding this case. News reports and commentary on the circumstances surrounding plaintiff's departure from KMBC began within days after she was removed as co-anchor and increased as trial approached. The effect of this pretrial publicity was explored during voir dire, but the news coverage of course continued after the jury was impaneled. Although the jury was repeatedly admonished not to discuss the case with anyone and to disregard news accounts of the trial, even the most conscientious juror would have been unable to ignore the pervasive and relentless publicity and could not have been immune from its effect.

In support of its motion for new trial, defendant has filed two volumes which contain only a sampling of the local and national coverage of the case by newspapers and wire services. In addition, the trial received obsessive attention from local television stations and the national networks. Although cameras were not allowed in the courtroom, television crews were frequently stationed at the perimeter of the building, recording the comings and goings of trial participants. Present each day in the gallery were courtroom artists and a substan-

tial number of reporters, including some whose faces were undoubtedly well known to the jurors. During closing arguments, the gallery was literally crammed to capacity.[2] The news accounts resulting from all this attention in most instances described the case in terms of plaintiff's prayer for $1.2 million in damages and her allegation that defendant told her she was "too old, too unattractive, and not deferential enough to men." The ceaseless incantation of these allegations worked to the advantage of plaintiff and to the serious detriment of defendant.

Consistent with the customary practice in civil cases in this district, the jury was never sequestered. The court is firmly convinced that, as a result, the jury became so infected with passion and prejudice that it was unable to discharge its duty of fairness to both parties. Upon retrial, the jury will be sequestered to assure both parties an impartial jury.

Two additional measures will be taken to ensure the integrity of the jury. First, the case will be retried to a jury of twelve. See Local Rule 14 C. See also 9 C. Wright & A. Miller, Federal Practice and Procedure § 2491 (1971 & Supp.1982). This should reduce the risk that one or two headstrong jurors might unduly influence the jury and should increase the chances that reason will prevail over passion. Second, the case will be retried in Joplin, Missouri, in the Southwestern Division of this District. Moving the case away from Kansas City should reduce the level of trial publicity and make it more likely that the jury can reach a decision based solely on the evidence presented in court. In addition, jury selection should be easier since it is less likely that prospective jurors in the Southwestern Division will have been exposed to the intense publicity which emanated from Kansas City during the first trial.

Because of the excessive verdict attributable to incomplete instruction of the jury and to incessant and overwhelming trial publicity, a new trial on all issues raised under Count III is required. Reduction of the damage award by remittitur is inappropriate because passion and prejudice influenced not only the jury's calculation of damages but also its decision on the threshold issue of liability. See Richardson v. Communications Workers of America, 530 F.2d 126, 129 (8th Cir.) (in excessive verdict cases, decision whether to reduce verdict or grant new trial is primarily for trial court), cert. denied, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976).

## IV. CONCLUSION

For the reasons stated, it is

ORDERED that judgment is entered in favor of defendant and against plaintiff on Count I of her complaint. It is further

ORDERED that plaintiff's Motion for a New Trial on the Equal Pay Act Claim is denied. It is further

ORDERED that defendant's alternative motions for judgment notwithstanding the verdict or for remittitur on Count III are denied. It is further

ORDERED that defendant's alternative motion for a new trial on Count III is granted. Retrial of all issues raised under Count III will begin at 9:30 a.m. on Wednesday, January 4, 1984, at the Federal Courthouse in Joplin, Missouri; a jury of twelve will be impaneled and will be sequestered throughout the proceedings. It is further

ORDERED that no later than Friday, November 18, 1983, each side shall file suggestions concerning the most appropriate method by which to conduct an orderly, efficient, and searching voir dire of prospective jurors. It is further

ORDERED that proposed jury instructions shall be filed no later than Friday, December 9, 1983.

2. By an unfortunate circumstance of timing, the jury retired to deliberate late on a Friday afternoon. Deliberations were recessed over the weekend, thereby increasing the risk that the jury was exposed to prejudicial publicity at a crucial point in the trial.