Christine A. CRAFT, Appellee/Cross-Appellant,

v.

METROMEDIA, INC., Appellant/Cross-Appellee.

Nos. 84–1336, 84–1380.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1985.

Decided June 28, 1985.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 19, 1985.

Donald W. Giffin, Kansas City, Mo., for appellant/cross-appellee.

Dennis E. Egan, Kansas City, Mo., for appellee/cross-appellant.

Before LAY, Chief Judge, and McMILLI-AN and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Christine Craft was reassigned from coanchor to reporter by KMBC–TV in Kansas City, Missouri, and as a result brought this action against the station's owner and operator, Metromedia, Inc. Craft alleged that she had been discriminated against on the basis of sex in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982), and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1982), and that she had been fraudulently induced into accepting the KMBC employment. The primary focus of the suit was KMBC's concern with appearance—whether the station's standards for on-air personnel were stricter and more strictly enforced as to females than as to males and whether the station misrepresented to Craft its intentions as to changing her appearance to persuade her to accept the anchor job. The district court [1] found against Craft on her

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Eastern and West-ern Districts of Missouri.

Title VII sex discrimination claim and refused a new trial as to the jury verdict against her on her equal pay claim. The court, however, set aside as excessive the jury verdict in Craft's favor on the fraud claim and ordered a new trial. *Craft v. Metromedia, Inc.*, 572 F.Supp. 868 (W.D. Mo.1983). Craft appeals from these rulings while Metromedia appeals from the judgment on the jury verdict, again in Craft's favor, in the second fraud trial. We affirm the Title VII and Equal Pay Act judgments against Craft but further conclude that she did not make a submissible case on her fraud claim and thus reverse the judgment against Metromedia on that issue.

Christine Craft commenced her television career in mid-1975 as a weeknight weather reporter at a small station in Salinas, California. After about a year and a half, during which she also worked as an announcer, reporter, and substitute sportscaster, she became the weekend weather anchor at a San Francisco television station. She spent a year there, again handling some additional news and substitute sports assignments.

Craft then was hired by Columbia Broadcasting System to host the "Women In Sports" portion of its network television program "CBS Sports Spectacular." At the network's behest she had her hair cut short and bleached blond. She was required to use black eyebrow pencil and dark red lipstick, and a CBS technician applied heavy makeup before every on-air appearance. "Women in Sports" was discontinued after thirty weeks, and Craft returned to California.

About a year later Craft resumed her television career as a reporter at a station in Santa Barbara, California. She remained there, also serving as coanchor of the late news and occasionally doing sports and weather, until December 1980, when she began work at KMBC.

KMBC, having slipped in its local news ratings, had determined to adopt the coanchor format used by its two major competitors in Kansas City. Furthermore, it had determined that, because of the perceived "coldness" of its anchor, Scott Feldman, the new position was to be filled by a female to "soften" its news presentation. The station obtained tapes of a number of performers, including Craft, from Media Associates of Dallas. After studying these tapes, KMBC news director Ridge Shannon contacted Craft, among other individuals, to see if she was interested in auditioning for the job. Craft described her unpleasant experience at CBS and made plain that she was not interested if KMBC intended a "makeover" of her appearance. She continued to stress this point while in Kansas City for the audition, and Shannon and R. Kent Replogle, vice president and general manager of KMBC, assured her they planned no changes such as those at CBS. Shannon did mention that KMBC made some use of consultants, and Craft indicated some willingness to work on her appearance and dress.

Craft accepted the coanchor position at KMBC and at the station's request stopped in Dallas for a meeting with Lynn Wilford of Media Associates before reporting to Kansas City. She made her debut as coanchor on January 5, 1981, and the testimony is essentially uncontradicted that Shannon and Replogle immediately began having concerns about her clothing and makeup. Wilford came to Kansas City on January 14 to work with Craft on dress as well as on various aspects of her presentation technique. It was during this visit that Wilford for the only time applied Craft's makeup, and the results on the 6 p.m. news were so unsatisfactory that Craft was allowed to remove the makeup before the 10 p.m. broadcast.

In the following months Shannon continued to make occasional suggestions or criticisms as to certain articles of Craft's clothing, and Craft was provided with materials, including the book *Women's Dress for Success*, on wardrobe and makeup. Then, beginning in April, KMBC arranged for Macy's Department Store to provide clothing for Craft in exchange for advertising time. Craft was assisted by a consultant

from Macy's in selecting outfits. She would then return to the KMBC studio, try on the clothing, and appear before camera so tapes could be made to send to Wilford for review.

On May 19 and 20, 1981, Media Associates initiated some research of viewer perceptions of KMBC's newscasts by conducting four "focus group" discussions. By this technique groups of ten individuals viewed sample video tapes of local news programs and then gave their reactions in sessions moderated by a Media Associates representative. The response to Craft's appearance was, as summed up by the district court, "overwhelmingly negative." 572 F.Supp. at 873. When Replogle and Shannon met with Craft the following day to discuss this result, Craft at first wanted to be let out of her contract to return to California. Replogle, however, stated that management was ready to work with her to overcome the problems, and Craft ultimately agreed to cooperate. Thereafter, her wardrobe was more closely supervised, and the "clothing calendar"[2] then mentioned by Replogle was eventually instituted in late July or early August.

As a further follow-up, KMBC and Media Associates in late June conducted a telephone survey of some 400 randomly selected persons in the greater Kansas City viewing area. These persons were asked to respond to a questionnaire specifically drafted to pursue issues raised in the focus group discussions. For example in one segment the survey participants were asked to rank Craft in comparison with the female coanchors at KMBC's competitors in response to some fourteen statements, four of which dealt with "good looks" or the dress of and image of a "professional anchor woman." Craft came out trailing in almost every category. Media Associates' report on the results of this survey, which

was conveyed to Shannon and Replogle on August 3, 1981, suggested that Craft was having an extremely adverse impact on KMBC's acceptance among Kansas City viewers. On August 13 Media Associates recommended that Craft be replaced, and KMBC, after initial resistance, agreed.

The next day Shannon told Craft she was being reassigned to reporter at no loss of pay or contractual benefits. He characterized the results of the research, in the language of the district court, as "devastating and unprecedented in the history of the consultants of Media Associates." 572 F.Supp. at 874. Craft states that Shannon also told her she was being reassigned because the audience perceived her as too old, too unattractive, and not deferential enough to men. Shannon, however, specifically denies making such a statement, and the district court believed his version of the conversation. *Id.*

After the weekend Craft sent a telegram to KMBC refusing to accept reassignment, and when further discussions failed to resolve the matter, she returned to Santa Barbara where on September 1, 1981, she commenced work as a coanchor at the television station at which she previously had been employed. This suit followed in four counts: the Title VII sex discrimination and the fraud counts, the allegation of violation of the Equal Pay Act based on the differential between Craft's and Scott Feldman's salaries, and an allegation of prima facie tort based on an intent by KMBC to injure Craft. This last count was abandoned during the first trial in Kansas City.

■ Following that first trial the district court rejected the findings of the advisory jury[3] on the Title VII sex discrimination claim and entered judgment for Metromedia on that issue. The district court found that KMBC required both male and female on-air personnel to maintain professional,

---

**2.** The "clothing calendar" was a calendar given to Craft showing in detail for each day the blazer, blouse, and skirt (or occasionally slacks) she was to wear. A note in one corner indicated that the appropriate accessory would be either a single strand of pearls or a single gold chain.

**3.** There is no right to a jury trial in a Title VII suit. *Harmon v. May Broadcasting Co.,* 583 F.2d 410, 410 (8th Cir.1978). Advisory use of the jury is authorized by Rule 39(c) of the Federal Rules of Civil Procedure.

businesslike appearances "consistent with community standards" and that the station enforced that requirement in an evenhanded, nondiscriminatory manner. 572 F.Supp. at 877–78. Any greater attention to Craft's appearance, the court concluded, was "tailored to fit her individual needs" and was necessary because of her "below-average aptitude" in matters of clothing and makeup. *Id.* at 878. The district court also found that Craft had not been constructively discharged because there was insufficient evidence that her working conditions had become so intolerable that she had no choice but to quit or that KMBC had intended to force her resignation. *Id.* at 879. Finally, the court concluded that the telephone survey conducted by Media Associates had not been discriminatory or designed to effect Craft's removal as coanchor and that KMBC had reasonably relied on the survey results as the basis for the personnel change. *Id.* at 873, 878–79.

As to the Equal Pay Act count, the district court upheld the jury verdict in favor of Metromedia and refused to grant Craft a new trial. It rejected her allegations of error in the jury instructions and in the exclusion of certain testimony and concluded that the weight of the evidence was not contrary to the jury's finding that Feldman's higher salary was based on permissible factors such as his education in broadcasting, his greater experience in major television markets, and his established identity with Kansas City viewers.[4] *Id.* at 876, 879–80.

The district court, however, granted Metromedia a new trial on the fraud count. In a bifurcated procedure the Kansas City jury had found liability and awarded Craft $375,000 in actual damages and then, after additional instructions, had awarded her $125,000 in punitive damages. The court declared itself "firmly convinced" that the verdict was "excessive" and "the result of

passion, prejudice, confusion, or mistake on the part of the jury." *Id.* at 881. In support it cited the "unprincipled" award of actual damages nearly double that requested by Craft in her complaint (and nearly four times the amount she asked for at closing argument), instructional errors as to wrongful discharge and in the implementation of the bifurcated damages submission, and the "incessant and overwhelming" publicity surrounding the case. *Id.* at 881–82. The district court ordered that the new trial on the fraud count be held in Joplin, Missouri, with the jury to be sequestered. *Id.* at 882.

On retrial the jury again found for Craft, awarding $225,000 actual and $100,000 punitive damages. After the district court denied motions for judgment notwithstanding the verdict and for another new trial, Metromedia filed this appeal and Craft cross-appealed from the adverse determinations on her Title VII and Equal Pay Act claims.

## I.

Craft's attacks on the district court's disposition of her Title VII sex discrimination claim are essentially factual, rather than legal as she contends. Her central position is that KMBC's appearance standards were based on stereotyped characterizations of the sexes and were applied to women more constantly and vigorously than they were applied to men. Her further contentions that the district court erred in finding certain grooming cases controlling and in allowing Metromedia to rebut her prima facie case with stereotypical customer preferences follow only if we accept her central factual position.

## A.

█ As an initial matter Craft argues that, since her case was one involving di-

---

**4.** Craft had also asserted the pay differential as an incident of sex discrimination in violation of Title VII, but the district court held that that claim was merely duplicative of the Equal Pay Act count and found the jury verdict dispositive. *See Orahood v. Board of Trustees of the Univ. of Ark.,* 645 F.2d 651, 654 n. 3 (8th Cir.1981) (defendant may not be held liable under Title VII when one of four affirmative defenses of the Equal Pay Act has been established); *see generally Washington County v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

rect evidence of discrimination, the district court erred in failing to shift the burden to Metromedia to prove by a preponderance of the evidence that it would have taken the challenged actions even in the absence of gender bias. *E.g., Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983), *cert. denied,* —— U.S. —— 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). The cases relied on by Craft, however, involved direct testimony of discrimination accepted by the trier of fact. *Bell,* 715 F.2d at 1557; *Lee,* 684 F.2d at 774–75. It is apparent that the district court did not accept any such testimony in this case. Thus, the burden-shifting rule for which Craft argues could have no application here, and we need not give further consideration to whether it should be adopted by this circuit. *See Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 724 (8th Cir.1984) (no direct evidence that employer acted with a discriminatory motive); *see also Norcross v. Sneed,* 755 F.2d 113, 118 (8th Cir.1985) (to same effect in handicapped discrimination suit under 29 U.S.C. § 794 (1982)).

In the alternative, Craft argues that she also established a Title VII violation through use of circumstantial evidence and inferences under the *McDonnell Douglas* pattern of proof.[5] The district court plainly considered whether KMBC's position was pretextual, which indicates that it reached its decision through this mode of analysis. On review, however, we need not discuss the record in terms of "prima facie case," "articulation of a legitimate, nondiscriminatory reason," and "pretext" but instead may look directly to the ultimate factual issue: whether the defendant intentionally discriminated against the plaintiff. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715,

103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *see Easley v. Empire Inc.,* 757 F.2d 923, 929–30 (8th Cir.1985). As the district court recognized, the burden of proof on this issue always remains with the plaintiff. *Craft,* 572 F.Supp. at 876–77 (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). A finding of intentional discrimination is a factual finding, *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), *cited in Anderson v. City of Bessemer City,* —— U.S. —— 105 S.Ct. 1504, 1508, 84 L.Ed.2d 518 (1985), and the court found against Craft.

Finally, Craft argues that the district court erred in finding her claim of discrimination in employment conditions controlled by grooming cases such as *Knott v. Missouri Pacific Railroad,* 527 F.2d 1249 (8th Cir.1975). In *Knott* we held that appearance regulations making distinctions on the basis of sex will not support allegations of discrimination when the standards are reasonable and are enforced as to both sexes in an evenhanded manner. *Id.* at 1252. Again what Craft really contests is the district court's *factual* determination that KMBC's actions concerning the appearance of its on-air personnel fell within the *Knott* guidelines.

Because many of Craft's arguments boldly seek reevaluation of the evidence and rejection of the district court's factual findings, we make clear our limited standard of review in such cases. Factual findings may be set aside only when clearly erroneous. *See* Fed.R.Civ.P. 52(a). Our "foremost principle" is that " 'a finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the defi-

---

5. Under the analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), after a party suffering an adverse employment action proves some set of facts—the "prima facie case"—sufficient to give rise to an inference that the employer was motivated by discrimination, the employer must

then articulate a legitimate reason for the decision so as to dispel the inference of discrimination while finally the aggrieved party has the opportunity to show that the reason articulated was a pretext and that the employer actually was improperly motivated. *See generally Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

nite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *see Hoefelman v. Conservation Commission of Missouri,* 718 F.2d 281, 285 (8th Cir.1983). We may not duplicate the function of the district court by making our own determination of the facts and reversing if we believe we would have decided the case differently: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 105 S.Ct. at 1512; *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 857–58, 102 S.Ct. 2182, 2190–91, 72 L.Ed.2d 606 (1982).

■ Furthermore, we have stated that the burden is on the objecting party to clearly demonstrate error in the factual findings. *Aetna Casualty & Surety Co. v. General Electric Co.,* 758 F.2d 319, 323 (8th Cir.1985); *Hunt v. Pan American Energy,* 540 F.2d 894, 901 (8th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977); *Reilly v. United States,* 513 F.2d 147, 150 n. 2 (8th Cir.1975). The evidence is to be construed in the light most favorable to the party prevailing below. *Tautfest v. City of Lincoln,* 742 F.2d 477, 481 (8th Cir.1984); *United Barge Co. v. Notre Dame Fleeting & Towing Service,* 568 F.2d 599, 602 (8th Cir.1978).

### B.

We turn first to the most prominent factual element of Craft's case—her testimony that Shannon told her she was being reas-

signed because she was too old, too unattractive, and not deferential enough to men or because the audience perceived her as such. Shannon, however, specifically denied making that statement. The only additional evidence [6] was that of Feldman, who testified on the stand at trial that he did not recall Shannon making such a comment but who had said in his deposition that Shannon had done so—again diametrically opposite testimony, this time from one witness. Credibility thus was central to the district court's finding on this point.

■ Respect for the role of the district court is especially crucial as to determinations which rest on "variations in demeanor and tone of voice" of the witnesses and "the listener's understanding of and *belief in* what is said." *Anderson,* 105 S.Ct. at 1512 (emphasis added). The Supreme Court has cautioned:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can *virtually never* be clear error.

*Id.* at 1513 (emphasis added). The district court was in the best position to determine whether to believe Shannon or Craft, and there are no circumstances suggesting any basis for finding clear error in the district court's choice in favor of Shannon.

Craft next argues, as do the amici curiae, that the district court clearly erred in failing to find that KMBC enforced appearance standards more strictly as to female

---

**6.** Craft argues that the statement attributed to Shannon would be consistent with the survey results and the station's interpretation thereof; however, no questions on the survey dealt with age, and Craft actually was rated lowest among her female counterparts as to the *strength* "does not play second fiddle" to male anchor. The testimony of Brenda Williams that Shannon told her Craft was being removed because people didn't like her appearance is basically consistent with what the district court found Shannon did tell Craft and does not support the idea

that Shannon went further and made the "too old" comment. Finally, Craft argues that the district court never expressly rejected her testimony that Shannon also told her viewers wanted to see "young, pretty women for news anchors." We believe, however, that this statement was implicitly discounted by the court through its failure to include any such comment in its affirmative findings as to what Shannon did say to Craft and through its discrediting of the "too old, too unattractive" testimony. *Craft,* 572 F.Supp. at 874.

than as to male on-air personnel.[7] In support of her position she points to the evidence most favorable to her, which shows that only females were subject to daily scrutiny of their appearance or were ever required to change clothes at the station before going on the air and that no male was ever directed to take time from his journalistic duties to select clothing, with the help of a consultant, from Macy's and to test that clothing on camera for the approval of another consultant. The district court, however, concluded that such facts, in light of other evidence, showed only that KMBC was concerned with the appearance of all its on-air personnel and that it took measures appropriate to individual situations, characteristics, and shortcomings. *Craft,* 572 F.Supp. at 875, 876, 878. The court found that KMBC had only gradually increased its attentions to Craft's appearance, with the institution of the clothing calendar representing the culmination of efforts made necessary when lesser suggestions, such as those complied with by other personnel, proved ineffective. *Id.* at 878.

The evidence shows that one female, Brenda Williams, had never been the subject of criticism for her appearance while numerous males on occasion had been given specific directions as to their individual shortcomings. Mike Placke, for example, had been told to lose weight, to get better-fitting clothes, to refrain from wearing sweaters under jackets, and to tie his necktie in a certain manner. Similarly, Michael Mahoney had been told to lose weight and to pay more attention to his wardrobe and

hairstyle, while Bob Werley had been told to try wearing contact lenses and to get a hair piece and had been given a makeup chart on a form similar to that used with Craft. Shannon had discussed hair or moustache problems with Tim Richardson, Dave Dusik, Stan Carmack, and Corrice Collins, and Craig Sager had been advised to improve his wardrobe. Even Feldman on at least two occasions had received specific directives regarding his choice of shirts, and the Macy's clothing consultant who worked with Craft testified that she had also met with Feldman and Dusik. Media Associates eventually prepared wardrobe "dos" and "don'ts" for male as well as female newscasters.[8] The district court found that the male personnel generally complied with grooming suggestions.

An interpretation of this record as showing that KMBC enforced its appearance standards equally as to males and females in response to individual problems is neither "illogical" nor "implausible" and has "support in inferences that may be drawn from the facts." *Anderson,* 105 S.Ct. at 1513. We cannot conclude that the district court erred in this respect.

Our determination is not altered by the testimony, cited by Craft, of the consultant Wilford or of other female KMBC employees to the effect that the station put more emphasis on the appearance of females. This testimony represents only the opinions and impressions of the witnesses as to KMBC's policy, and the district court by implication rejected such opinions, making its own finding to the contrary on the record.[9] The court also apparently chose

---

7. The court instead concluded,
 If anything, [the] evidence shows a consistent concern by management over the appearance of all on-air personnel without regard to sex but with regard to the peculiar characteristics of each employee. Plaintiff was an employee of atypical aptitudes and attitudes, and defendant merely acted to correct appearance problems which plaintiff was unable or unwilling to remedy. The actions taken by defendant in regard to plaintiff's appearance were not the result of any general animus toward women or of any specific animus toward plaintiff as a woman. It may well be that in plaintiff's case some of the steps taken

by management were unprecedented, but they were not ipso facto discriminatory.
 *Craft,* 572 F.Supp. at 878.

8. Shannon testified that the tips for females were prepared in May 1981 primarily for Craft while the guides for males were not prepared until November 1981, around three months after Craft left the station.

9. Furthermore, the female employees generally testified only that they had no *knowledge* of criticisms by KMBC of the appearance of male on-air personnel. In a strict sense such testimony is not even inconsistent with that of Shannon that such criticisms were made.

not to believe testimony by Pam Whiting that Shannon had said it was more important for she and Craft than for Feldman to look good on the air; Whiting herself had been subject to a great deal of attention as to her appearance and had eventually left the station, and on the stand she expressed the opinion that appearance was overemphasized in television news and said she hoped Craft prevailed. Finally, the district court attributed the use in the survey of questions on appearance and good looks only as to female anchors as prompted not by sexual bias but by the concerns raised as to Craft by the focus groups. *Craft,* 572 F.Supp. at 873. The viewers were asked to rank the male anchors on more points concerning personality and "coldness," Feldman's perceived weaknesses. The inclusion of a makeup criterion and a requirement that Craft not deviate from her clothing calendar in the "standards of performance" by which her work was to be evaluated, in contrast to the absence of any appearance objectives in Feldman's "standards of performance," similarly just reflected management's efforts to pursue with personnel their individual weaknesses.[10]

Craft further argues, however, again joined by the amici curiae, that even if KMBC was evenhanded in applying its appearance standards, the district court erred in failing to recognize that the standards themselves were discriminatory.[11] She contends that she was forced to conform to a stereotypical image of how a woman anchor should appear. The evidence included a communication from the consultant, Wilford, to Shannon suggesting that Craft purchase more blouses with "feminine touches," such as bows and ruffles, be-

cause many of her clothes were "too masculine." The general wardrobe hints for females developed by Media Associates warned that women with "soft" hairstyles and looks should wear blazers to establish their authority and credibility while women with short "masculine" hairstyles shouldn't wear "masculine" clothing in dark colors and with strong lines because they would appear too "aggressive." The district court found that Craft had been hired to "soften" KMBC's news presentation. *Id.* at 871.

The "dos" and "don'ts" for anchors suggested that while males should remember "professional *image*," female anchors were to remember "professional *elegance*" (emphasis added). The outfits on the clothing calendar given to Craft were dominated by recognized fashion labels. Wilford testified that in April she had told Craft not to wear the same outfit more than once every three to four weeks because people would start calling in about it; males, however, Wilford said, could wear an outfit every week and a suit even twice within the same week if combined with a different tie. Wilford further testified that viewers—particularly other women—criticize women more severely than men for their appearance on camera and that women's dress is more complex and demanding because "society has made it that way." Craft's argument is that these differing standards as to females reflect customer preferences, which a number of cases have held cannot justify discriminatory practices. *E.g., Diaz v. Pan American World Airways,* 442 F.2d 385, 389 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *see also Gerdom v. Continental Airlines,* 692 F.2d 602, 609 (9th Cir.1982), *cert. dismissed,* 460

---

**10.** Feldman's temper and personality, for example, were his special problems. He frequently argued with the female producers, and management had spoken to him about his "throwing curve balls" during newscasts to fluster other on-air personnel. In addition, he had been sharply reprimanded for referring to Craft in the newsroom as "that girl."

**11.** The court instead concluded,

Thus, defendant's standards of appearance for its on-air personnel can in no way be considered discriminatory per se. Both men and women were required to maintain a professional, business-like appearance consistent with community standards. Since television is a visual medium, as plaintiff admitted in her testimony, such a reasonable requirement is obviously critical to defendant's economic well-being.

*Craft,* 572 F.Supp. at 877.

U.S. 1074, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983); *Fernandez v. Wynn Oil Co.,* 653 F.2d 1273, 1276–77 (9th Cir.1981).

■ The district court, however, found that KMBC's appearance standards were based instead on permissible factors. 572 F.Supp. at 877. While there may have been some emphasis on the feminine stereotype of "softness" and bows and ruffles and on the fashionableness of female anchors, the evidence suggests such concerns were incidental to a true focus on consistency of appearance, proper coordination of colors and textures, the effects of studio lighting on clothing and makeup, and the greater degree of conservatism thought necessary in the Kansas City market. The "dos" and "don'ts" for female anchors addressed the need to avoid, for example, tight sweaters or overly "sexy" clothing and extreme "high fashion" or "sporty" outfits while the male "dos" and "don'ts" similarly cautioned against "frivolous" colors and "extreme" textures and styles as damaging to the "authority" of newscasters. These criteria do not implicate the primary thrust of Title VII, which is to prompt employers to "discard outmoded sex stereotypes posing distinct employment disadvantages for one sex." *Knott v. Missouri Pacific Railroad,* 527 F.2d 1249, 1251 (8th Cir.1975); *see generally* Note, *Title VII Limits on Discrimination Against Television Anchorwomen on the Basis of Age-Related Appearance,* 85 Colum.L.Rev. 190, 201 (1985).[12]

Courts have recognized that the appearance of a company's employees may contribute greatly to the company's image and success with the public and thus that a reasonable dress or grooming code is a proper management prerogative. *E.g., Fagan v. National Cash Register Co.,* 481 F.2d 1115, 1124–25 (D.C.Cir.1973); *La Von Lanigan v. Bartlett & Co. Grain,* 466 F.Supp. 1388, 1392 (W.D.Mo.1979). Evidence showed a particular concern with appearance in television; the district court stated that reasonable appearance requirements were "obviously critical" to KMBC's economic well-being; and even Craft admitted she recognized that television was a visual medium and that on-air personnel would need to wear appropriate clothes and makeup. *Craft,* 572 F.Supp. at 877; *see* Note, *supra,* at 201 ("As television is a visual medium, television networks and local stations clearly have a right to require both male and female anchors to maintain a professional appearance while on camera."). While we believe the record shows an overemphasis by KMBC on appearance, we are not the proper forum in which to debate the relationship between newsgathering and dissemination and considerations of appearance and presentation—i.e., questions of substance versus image—in television journalism. The record does not leave us with the "definite and firm conviction" that the district court erred or adopted an impermissible view of the evidence when it concluded that KMBC's appearance standards were shaped only by neutral professional and technical consider-

---

**12.** Dress requirements that have been found to violate Title VII have generally involved, for example, demeaning stereotypes as to female characteristics and abilities or stereotypical notions of female attractiveness or use of female sexuality to attract business. *E.g., Gerdom v. Continental Airlines,* 692 F.2d 602, 608–09 (9th Cir.1982) (weight requirements for female flight attendants to insure slenderness), *cert. dismissed,* 460 U.S. 1074, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983); *Carroll v. Talman Fed. Sav. & Loan Ass'n,* 604 F.2d 1028, 1032–33 (7th Cir.1979) (requirement that only female employees wear uniforms was demeaning and implied that females had lesser professional status and was based on the stereotype that females are so caught up in competition as to appearance that they cannot adhere to good business taste as to dress), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1316, 63 L.Ed.2d 762 (1980); *Laffey v. Northwest Airlines,* 567 F.2d 429, 439 n. 24 (D.C.Cir.1976) (female cabin attendants forbidden to wear eyeglasses), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *Equal Empl. Opportunity Comm'n v. Sage Realty Corp.,* 507 F.Supp. 599, 607–11 (S.D.N.Y.1981) (female lobby attendant required to wear revealing and provocative uniform that subjected her to sexual harassment). *Cf. Wilson v. Southwest Airlines Co.,* 517 F.Supp. 292 (N.D.Tex.1981) (flight attendant position limited to females by employer who merely wished to exploit female sexuality as a marketing tool to attract customers and insure profitability).

ations and not by any stereotypical notions of female roles and images.

■ We further reject the argument of Craft that the perception, discussed above, that she would add warmth and "comfortability" to the newscast defined a stereotypical "female" role, secondary to that of the male anchor, into which she was forced in terms of story assignments and division of duties. First, we observe that the research survey asked participants to rank both male and female anchors in response to the statement "comfortable to watch." In addition, the district court rejected Craft's factual contention that Feldman was assigned the lead story more frequently and was given more live stories while she was assigned the human interest, personal, and humorous stories. The court, for example, while acknowledging the testimony of news producer Sandra Woodward that she initially was instructed to give Feldman about two-thirds of the lead stories, also accepted testimony of Shannon that that policy had been designed to ease the transition to coanchors for Craft and the viewers and was discontinued after a few weeks, after which time the lead stories were equitably divided. *Craft*, 572 F.Supp. at 872, 875. The court further found that the on-site reporting and hard news stories were equitably distributed. *Id.* at 875. Finally, Shannon testified that Craft herself suggested her Thursday arts and entertainment segment to take advantage of her cultural background and her contacts from Santa Barbara with various Hollywood personalities. Craft cites no facts sufficient for us to find the district court's interpretation of the record in this regard clearly erroneous.

■ We also cannot conclude that the district court erred when it held that Craft was not impermissibly removed as anchor on the basis of gender. While we disposed earlier of the alleged "too old, too unattractive" statement and have also already discussed the legitimate reasons why the survey questions focused on appearance only as to the female and not as to the male anchors, Craft further argues that her reassignment was based on a discriminatory interpretation of the survey results. She contends that discrimination may be inferred in that KMBC attributed all the negative viewer reaction to her despite Feldman's earlier problems in the ratings and the failure of most respondents to name him as a positive reason for watching the station. She further alleges that she was unfairly burdened with having to offset Feldman's weaknesses. The inferences on which she relies, however, are insufficient to justify setting aside the conclusions of the district court.

■ Craft essentially is asking us to reject the district court's findings accepting Media Associate's interpretation of the survey data and to substitute our own interpretation thereof. The evaluation of expert testimony, however, is primarily the function of the district court. *Hoefelman v. Conservation Commission of Missouri*, 718 F.2d 281, 284–85 (8th Cir.1983). The court here specifically found that the survey had been "conducted in accordance with generally accepted principles of survey research" and that its results were "trustworthy." *Craft*, 572 F.Supp. at 873. Craft scored low on many neutral points such as knowledge of Kansas City, journalism ability, and apparent enjoyment of her job, and the court found "simply no evidence" that the survey had been designed to effect her removal because of her gender. *Id.* at 878. It concluded that KMBC was entitled to—and did—rely on the Media Associates report. *Id.* at 879.

■ We further reject Craft's argument that even if the survey was objective, KMBC's reliance on it was merely a pretext because the station ignored improved ratings and profits during her tenure: This shows only that broadcast market research is an inexact science and does not make clearly erroneous the district court's conclusion that KMBC still relied upon the survey in good faith. The court in addition found that the ratings cited by Craft were "equivocal at best" and were not yet available when she was reassigned. *Id.* at 876. KMBC's failure to delay its decision a few

days until the ratings did come out may just be testament to the unprecedented negative reaction to Craft suggested by the survey. Finally, KMBC's allegedly differing treatment of two males who also were criticized in the survey is insufficient to raise an inference of discrimination because of the more extreme nature of Craft's difficulties and Craft's pivotal role on the newscast as coanchor.

## C.

■ Our conclusion that Craft was not subject to sex discrimination either in KMBC's application of its appearance standards or in its reassignment of her to reporter effectively determines the outcome of her claim of constructive discharge. Craft does not dispute that such a claim requires a showing of work conditions that a reasonable person would find intolerable, *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981); she contends, however, that a finding of unlawfully discriminatory working conditions is sufficient to meet this standard. *See Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982). Given the absence of such a finding here, her argument fails. Furthermore, even if we were to accept Craft's argument that her reassignment (which was permitted by the terms of her contract) or the criticism of her appearance, while not discriminatory, did make her working conditions intolerable, the district court found no evidence that KMBC took those actions with an intent to force her to quit. *See Bunny Bread*, 646 F.2d at 1256. The court in fact believed testimony that Replogle in May had urged Craft to remain as anchor and that Shannon at the time of the reassignment had urged Craft to reconsider her immediate reaction and remain as reporter rather than returning to Santa Barbara. *Craft*, 572 F.Supp. at 874, 879.

## D.

In sum, Craft's arguments as to her Title VII discrimination claims are basically factual invitations to us to reevaluate the record and interpret the evidence in the light most favorable to her while overlooking substantial evidence favorable to KMBC.[13] Even her contention, for example, that the district court in finding no discrimination erred "as a matter of law" addresses a factual issue. To grant her relief we would have to adopt findings contrary to those of the district court and assume a judicial role contrary to that assigned to us by Rule 52(a) and Supreme Court precedent. *See Anderson, supra; Pullman-Standard, supra.* We decline to do either. The district court found that KMBC was equally concerned with the appearance of its male and female on-air personnel and that any extra attention to Craft was the gradual result of her indifference to the station's legitimate need that she maintain a professional businesslike image appropriate to Kansas City. The court further found that Craft's reassignment to reporter was made in reasonable reliance on a proper market survey and that no constructive discharge occurred. We are not firmly convinced that any of these conclusions is clearly erroneous.

## II.

Turning to the fraud claim, Metromedia argues that, as a matter of law, Craft failed to make a submissible jury issue. The alleged misrepresentation, as set out in the verdict directing instruction requested by Craft at the Joplin trial, was that "defendant represented to the plaintiff that her appearance was fine and that defendant liked everything about her appearance

---

**13.** Craft's argument rests in part on the failure of the district court to take into consideration many issues raised by her evidence. We have already discussed a number of such claims, and we do not believe the district court's order is deficient in failing to deal with every piece of evidence in the record, particularly in light of the ten-day trial resulting in a transcript in

excess of 2,000 pages. *See Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 605 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984); *Talley v. United States Postal Service,* 720 F.2d 505, 507 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984).

and intended no makeover or substantial changes in her appearance." [14] Specifically, Metromedia contends that this statement is one of opinion or value that will not support a fraud claim or is too indefinite to be actionable and that there is insufficient evidence that the statement was false or false when made.[15]

 The parties do not dispute that Missouri law applies to Craft's fraud claim. Under such law the burden is on the plaintiff to establish a submissible case of fraud, and failure as to any one essential element is fatal to the entire claim. *Powers v. Shore*, 248 S.W.2d 1, 5 (Mo.1952) (en banc); *Lowther v. Hays*, 225 S.W.2d 708, 713 (Mo.1950); *Emily v. Bayne*, 371 S.W.2d 663, 666 (Mo.Ct.App.1963). Fraud may be established by circumstantial evidence, *Martin v. Brune*, 631 S.W.2d 77, 80 (Mo.Ct.App.1982); however, it may not be presumed, and a party's case will fail if he can show only facts and circumstances which are equally consistent with honesty and good faith. *Macon-Atlanta State Bank v. Gall*, 666 S.W.2d 934, 941 (Mo.Ct. App.1984).

The standard of review as to the submissibility of Craft's case is the same under both federal and Missouri law. *Crues v. KFC Corp.*, 729 F.2d 1145, 1148 (8th Cir. 1984). We may find for Metromedia only if "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position" of Craft. *Id.* (quoting *Dace v. ACF Industries*, 722 F.2d 374, 375 (8th Cir.1983) (quoting *Decker-Ruhl Ford Sales v. Ford Motor Credit Co.*, 523 F.2d 833, 836 (8th Cir.1975)). Furthermore, we must resolve direct factual conflicts in favor of Craft, assume as true all facts in her favor which the evidence tends to prove, and give her the benefit of all reasonable inferences. We may not find for Metromedia if the evidence so viewed would "allow reasonable jurors to differ as to the conclusions that could be drawn." *See Crues*, 729 F.2d at 1148 (quoting *Dace*, 722 F.2d at 375).

### A.

It is true, as Metromedia argues, that a statement of opinion or value is not an actionable representation of fact because it relates to terms of degree capable of different interpretations. *E.g., Carrier Corp. v. Royale Investment Co.*, 366 S.W.2d 346, 356 (Mo.1963) (statement that a refrigerating machine is "easy" to install is not an actionable representation because the term "easy" has a comparative or relative connotation). While this principle may be relevant to KMBC's statements that it "liked" Craft's appearance, it is not controlling as to the more crucial portion of the submitted representation that the station did not intend any "makeover or substantial changes" in Craft's appearance.

 Statements of present intent may be representations of fact which, if false, will support fraud claims under Missouri law. *Kansas State Bank v. Citizens Bank of Windsor*, 737 F.2d 1490, 1498 (8th Cir. 1984); *White v. Mulvania*, 575 S.W.2d 184, 188 (Mo.1978) (en banc). We have no difficulty concluding that the "no makeover or substantial changes" representation requested by Craft in the instruction was a statement of present intent on the part of Shannon and Replogle. We do not believe the presence of somewhat imprecise terms such as "change" and "makeover" automatically renders their statement nonactionable "opinion" or "puffery" in the

---

14. At the first trial Craft also submitted as a representation that she was hired specifically for the job of coanchor and for no other purpose. She expressly abandoned this claim at the second trial in Joplin. Our review of the submissibility of the fraud claim is based on the record at that trial, but we observe that our study of the record of the Kansas City trial revealed no evidence favorable to Craft that was not also before the second jury.

15. Metromedia also argues that there is insufficient evidence that Craft relied on the alleged misrepresentation or suffered damages attributable thereto, that Craft waived her claim, and, in the alternative, that a third trial should be held because of errors in admission of evidence, the jury instructions, and closing arguments. Because of our disposition of the issues set forth in the body of our opinion, we need not reach these additional points.

classical sense argued by Metromedia. Missouri courts have found sufficient allegations of fraud for the jury when service station operators have been told their leases would not be canceled if they ran "good" operations and performed "satisfactorily." *Essex v. Getty Oil Co.*, 661 S.W.2d 544, 549–51 (Mo.Ct.App.1983); *Sagehorn v. Phillips Petroleum Co.*, 648 S.W.2d 647, 649 (Mo.Ct.App.1983).

### B.

The critical element in a fraud case based on a statement of present intent is proof that the speaker at the time of utterance actually did not intend to perform consistently with his words; absent such an inconsistent intent there is no misrepresentation of fact or state of mind but only a breach of promise or failure to perform. *See Grosser v. Kandel-Iken Builders*, 647 S.W.2d 911, 914 (Mo.Ct.App.1983); *Brennaman v. Andes & Roberts Brothers Construction Co.*, 506 S.W.2d 462, 465 (Mo.Ct.App.1973). It is not enough if for any reason, good or bad, the speaker changes his mind and fails or refuses to carry his expressed intention into effect. *Dillard v. Earnhart*, 457 S.W.2d 666, 670 (Mo.1970) (quoting *Restatement of Torts* § 530 comment a (1938)). As Missouri courts thus have held, an intent not to perform

> cannot be established solely by proof of [the speaker's] nonperformance nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. Such intention may be shown by any other evidence which sufficiently indicates its existence as, for example, the certainty that he would not be in funds to carry out his promise.

*Dillard*, 457 S.W.2d at 671 (quoting *Restatement of Torts* § 530 comment c (1938)). Craft's claim of fraud comes down to this narrow issue.

Craft argues vigorously that KMBC, contrary to the statements it made to her, had from the beginning a secret intention to substantially change or make over her appearance. She stresses Shannon's instruction to Wilford not to discuss makeup with Craft during their first meeting because he would be working with Craft himself on appearance and makeup. Wilford, prior to Craft's selection, had expressed the opinion that Craft's appearance was not conservative or sophisticated enough for Kansas City audiences, although the consensus of the group at Media Associates had been that Craft was the strongest of the three finalists it screened. Shannon testified that he knew when he hired Craft that he would be working on her makeup and clothing, and criticism of her appearance began with her debut on the newscast. Shannon further testified that appearance was KMBC's major concern in an anchor, and Replogle agreed that while appearance was not the only qualification, it was the "first thing on the list." The evidence established that KMBC in the past had given performers direct orders with respect to their appearance. For example, Cheryl Jones had been ordered to change her hairstyle to eliminate the "frizzy appearance" (she was given her most recent formal portrait as a guide to what Replogle and Shannon wanted and was told that the result had to be acceptable to them and that they would handle any questions from her hairdresser), and Mike Placke had been ordered to lose twenty-five pounds, to get a good-fitting suit, to avoid wearing sweaters and vests, and to tie his tie with a four-in-hand instead of a Windsor knot.

While this evidence supports the inference that Shannon and Replogle at the time they made the challenged statements knew they were going to work on Craft's appearance, we are not satisfied that it demonstrates that when they promised they intended "no makeover or substantial changes," such statements were false. It is well to consider further what "makeover or substantial changes" means.[16] The ulti-

---

**16.** Shannon and Replogle were convinced that the actions they took in regard to Craft did not

constitute a "makeover."

mate measure of the representation's truth or falsity is what Craft could reasonably have understood KMBC to have promised. *See Toenjes v. L.J. McNeary Construction Co.*, 406 S.W.2d 101, 105 (Mo.Ct.App.1966). She testified that a "makeover" was "changing someone's appearance" and that she had believed KMBC didn't want to change anything about her. This position, however, is not totally consistent with the *"substantial* changes" (emphasis added) language submitted in the jury instruction. It seems plain, thus, that a jury could not reasonably have measured the falsity of KMBC's representation against Craft's subjective view of a "makeover" as any change at all. Therefore, the intent to work on Craft's appearance demonstrated abundantly by her evidence does not establish that Shannon and Replogle at the time of their representation had the intention to "make her over."

While it can be argued that Craft was "made over" in being forced to exchange her casual California beach look—Shannon testified that Craft had told him that in Santa Barbara she occasionally went directly from the beach to the studio—for a conservative, sophisticated, businesslike image of "professional elegance," we believe that in her audition interviews with KMBC Craft was concerned essentially with her hair and makeup and not with clothing.[17] The language of an alleged misrepresentation must be considered in light of the background in which the statements were made and the context in which the words were used. *Toenjes*, 406 S.W.2d at 105. KBMC's statements to Craft were made in response to her expressions of concern about her experience with CBS, where the network had required that her hair be cropped and dyed blond, her eyebrows shaved and dyed black, and heavy makeup applied.

Even if Craft does have an arguable position that the representation of "no makeover or substantial changes" had application to clothing, a reasonable jury could not have found a "makeover" until KMBC's efforts reached their most extreme extent in the late days of Craft's employment. There is, however, no evidence that the station at the time it made the challenged representation knew it would exercise such an intrusive degree of control or knew that such control would be in its eyes necessary. The record demonstrates that KMBC asserted varying degrees of control over the appearances of its on-air personnel, finding no control at all necessary as to Brenda Williams while requiring assorted measures of other anchors, sportscasters and weathercasters. There is no evidence that the station had any knowledge where along this spectrum Craft might fall or what facility she might demonstrate in adjusting her wardrobe to the Kansas City climate and market. In fact, the record is basically uncontradicted as to the gradual increase in the intensity of the measures taken by KMBC in regard to Craft's appearance. Craft at first was given only the most general advice through books and fashion magazines and a memorandum suggesting makeup techniques. Although Wilford testified that she had been asked on short notice to come to Kansas City in January, just days after Craft's debut as coanchor, to work specifically on Craft's (and Pam Whiting's) appearance, it was not until April that the arrangement with Macy's and its clothing consultant was established. The clothing calendar was not actually instituted until late July or early August.

Having considered the record in the light most favorable to Craft and given her the benefit of all favorable inferences, we must conclude that there is insufficient evidence for a reasonable jury to have found that

17. The record reveals no action by KMBC in regard to Craft's hair or makeup that could be seen as constituting a "makeover." The station expressed a desire that her hair be worn at the length and natural color apparent in the Santa Barbara tape, and Craft assured the station that her shorter, lighter hairstyle upon arrival in Kansas City was due to a recent unsatisfactory styling and that she intended to let her hair grow back out. Furthermore, Craft was allowed to apply her own makeup except for the one ill-fated occasion, and we do not believe mere suggestions constitute a "makeover."

KMBC at the time it made its representation contemplated such extensive measures as to her appearance so as to make false its statements that it intended "no makeover or substantial changes." Even taking the evidence as establishing that KMBC's actions differed from those promised, the record does no more than suggest that the station, because of the difficulties it experienced with Craft, changed its mind as to steps that would be necessary as to her appearance. *See Dillard*, 457 S.W.2d at 670 (quoting *Restatement of Torts* § 530 comment a (1938)). Such evidence does not establish Craft's case of fraud or shift the burden to KMBC to show that its "nonperformance" was caused by reasons operating after it made its representation. *See Dillard*, 457 S.W.2d at 671 (quoting *Restatement of Torts* § 530 comment c (1938)). There is here, as in *Dillard*, a failure of proof that the statements of present intent were false when made. Craft as a matter of law has not established a submissible case of fraud. The judgment on the jury verdict on this issue must be reversed and the district court instructed to enter judgment in favor of Metromedia.

### III.

In view of our conclusion above we need not reach Craft's arguments that the district court's factual findings on her Title VII claim impermissibly conflicted with the findings of the jury on the fraud claim and that the district court erred in granting a new trial on the fraud issue. We note, however, that the authority to grant or deny a new trial is a matter of discretion which we may not reverse absent a strong showing of clear abuse. *Commercial National Bank v. Missouri Pacific Railroad*, 631 F.2d 563, 565 (8th Cir.1980); *Lane v. Chowning*, 610 F.2d 1385, 1388 (8th Cir. 1979); *Bates v. Hensley*, 414 F.2d 1006, 1011 (8th Cir.1969).

Finally, Craft argues that the district court erred in excluding certain evidence offered on her equal pay claim and that the verdict against her on that claim was against the clear weight of the evidence. Specifically, Craft contends that Brenda Williams should have been allowed to testify that she was told she would not be hired to replace Craft as coanchor if she held out for a salary comparable to Feldman's and to give her opinion that the station had created a "female anchor" position that would pay only an amount substantially less than that paid to the male anchor. The admission of evidence, however, also is within the discretion of the district court, and we may not reverse absent a "clear and prejudicial" abuse of that discretion. *Roth v. Black & Decker*, 737 F.2d 779, 783 (8th Cir.1984); *Haynes v. American Motors Corp.*, 691 F.2d 1268, 1272 (8th Cir.1982). When the excluded testimony is considered against the matters as to which Williams was allowed to testify before the jury, we cannot find such an abuse.

The weight of the evidence argument is particularly directed to the discretion of the district court; and while some of our decisions suggest that we could not review the denial of such a new trial motion even for abuse of discretion, *SCNO Barge Lines v. Anderson Clayton & Co.*, 745 F.2d 1188, 1194 (8th Cir.1984); *cf. Kelley v. Crunk*, 713 F.2d 426, 427 (8th Cir.1983) (per curiam) (weight of evidence arguments lead to serious seventh amendment questions), we need not reach that issue because we find no abuse of discretion here. *See Rey v. City of Fredericktown*, 729 F.2d 1171, 1174 (8th Cir.1984); *Aimor Electric Works v. Omaha National Bank*, 727 F.2d 688, 692 (8th Cir.1984); *Burnett v. Lloyds of London*, 710 F.2d 488, 489–90 (8th Cir. 1983) (per curiam); *Minnesota Mutual Life Insurance Co. v. Wright*, 312 F.2d 655, 659–60 (8th Cir.1963); *see generally* C. Wright & A. Miller, *Federal Practice and Procedure* § 2819 (1973).

We affirm the judgment of the district court as to all the Title VII and Equal Pay Act issues but reverse the judgment entered on the jury verdict on the fraud count and instruct the district court to enter judgment for Metromedia.