863 F.2d 47
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David BIELERT, Plaintiff-Appellant,
v.
NORTHERN OHIO PROPERTIES, Defendant-Appellee.
 No. 87-4031.
 United States Court of Appeals, Sixth Circuit.
 Nov. 25, 1988.
 
 Before KEITH, NATHANIEL R. JONES and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant David Bielert appeals from an order granting defendant-appellee Northern Ohio Properties' ("NOP") motion for summary judgment in this action alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., and the Rehabilitation Act of 1973, 29 U.S.C. Sec. 701 et seq. The principal issue on appeal is whether the district court erred in concluding that Bielert had failed to provide any material evidence to support his claim that he was constructively discharged from his employment with NOP because of his religious beliefs. For the reasons that follow, we affirm.
 
 I.
 
 2
 On June 8, 1984, Bielert commenced an action in the district court against NOP, claiming that his employment was terminated on account of his physical disability and/or religious beliefs. The handicap aspect of the complaint was originally premised solely upon section 503 of the Rehabilitation Act of 1973. 29 U.S.C. Sec. 703. However, on October 9, 1984, Bielert filed an amended complaint adding section 504 of the Rehabilitation Act. 29 U.S.C. Sec. 704. Pursuant to NOP's motion for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court dismissed Bielert's section 503 claim. By stipulation, the section 504 handicap discrimination claim was also subsequently dismissed, leaving Bielert's Title VII claim as the only issue before the district court.
 
 
 3
 Following discovery, which included depositions, interrogatories, and production of documents, NOP filed a motion for summary judgment on October 15, 1985. Both parties submitted briefs and affidavits. On October 16, 1987, the district court issued an opinion and order granting summary judgment for NOP dismissing the case. Bielert filed a timely notice of appeal on November 12, 1987.
 
 
 4
 NOP is engaged in the business of managing residential rental properties. It is a subsidiary of Zaremba Corporation, a closely-held corporation owned by various members of the Zaremba family. The immediate members of the Zaremba family subscribe to the Jehovah's Witness faith. The properties managed by NOP are owned by several different investor groups. In the greater Cleveland, Ohio, area, NOP managed fourteen separate apartment complexes, ranging in size from 36 to 1,552 rental units.
 
 
 5
 Bielert originally began working for NOP at a Chicago, Illinois, facility in 1971. He had previously worked for a predecessor of NOP. In 1973, he transferred from Chicago to Cleveland at the request of the Snavely Group, which requested that he be assigned to manage Hamilton House Apartments. The Snavely Group, a majority owner of that facility, is a partnership comprised of Thomas Snavely, John Snavely, and Tony Ranallo, all of whom are independent of the Zaremba family and all of whom subscribe to religious beliefs different from the Jehovah's Witness faith.
 
 
 6
 As a property manager for NOP, Bielert's responsibilities ranged from rent collection and housekeeping to landscaping and major renovation. He supervised maintenance workers, custodians, rental agents, housekeepers, and other assistants. He was responsible for budget preparations, maintaining the appearance of the building, resolving tenant complaints, and other similar duties.
 
 
 7
 After transferring to Cleveland, Bielert held two separate jobs for two distinct employers with the consent of NOP. While he was employed as a property manager for NOP, he was also employed by Stevens Management Company, a property management firm established by the Snavely Group. Stevens Management Company was formed to manage several of the Snavely Group's rental properties in the Cleveland area and is not connected with the Zaremba family or NOP.
 
 
 8
 In addition to Hamilton House, Bielert was assigned to manage other properties for NOP. These included Blake House, a 36-unit apartment complex adjacent to Hamilton House, and Marsol Towers, a 986-unit complex.
 
 
 9
 In September or October of 1979, Bielert learned that he had cancer. At the time, he was managing Hamilton House, Marsol Towers, and Blake House for NOP, in addition to performing his duties on behalf of Stevens Management Company. Bielert's cancer required him to be hospitalized and/or out of work from October 1980 until January 1981. During this time, he drew full salary from NOP and Stevens Management Company and attempted to manage the apartments by telephone. The job duties that he was unable to perform because of his illness were either absorbed by others at NOP or not performed.
 
 
 10
 When Bielert returned to work in January of 1981, he concedes that his illness left him in a weakened condition, and that he encountered difficulty performing some of the tasks required of a property manager. In his deposition, he conceded that he was "somewhat handicapped," and that his physician had advised him to be extremely careful while walking, particularly over ice and snow. Bielert also admitted that his illness and the restrictions imposed because of his illness impeded his ability to make the necessary inspections of the property and that he was also experiencing personal problems which interfered with his work performance.
 
 
 11
 The record reflects that Bielert's various problems began to have an adverse effect on the properties that he managed. Specifically, Stevens Management Company began to be dissatisfied with his management, as the properties were becoming dirty and in need of maintenance. On June 1, 1982, Bielert voluntarily resigned his position with Stevens Management Company.
 
 
 12
 At the same time that Bielert's performance for Stevens Management Company began to suffer, NOP also began to be dissatisfied with the quality of his work. Louis Leone, President of NOP at that time, expressed repeated dissatisfaction with the physical condition and profitability of the Marsol Towers. Tony Ranallo, one of the principals of the Snavely Group, informed Bielert that he was unhappy with the condition of Hamilton House. As a result, in October of 1981, NOP removed Marsol Towers from Bielert's management portfolio. While this left Bielert with reduced responsibility, his rate of pay did not change.
 
 
 13
 Even though his management responsibility had been reduced, NOP remained dissatisfied with Bielert's job performance. The Snavely Group principals began to notice "a gradual decline" in Hamilton House's appearance, particularly in its common areas, and that less attention was being paid to detail. In October of 1982, Tim Zaremba became president of NOP, replacing Louis Leone. Tim Zaremba noticed significant problems at Hamilton House, including dirty common areas, burned-out lights on the premises, trashy grounds, and excessive wage cost of support personnel. The record reflects that Louis Leone, who had been demoted to the position of executive vice president, was also concerned with the same problems at Hamilton House. He also observed that Bielert's budget procedure and attention to administrative details were inadequate.
 
 
 14
 In March of 1983, the majority owners of Hamilton House met with Tim Zaremba and Wally Zaremba (as secretary of NOP) to discuss the possible removal of Bielert as property manager of Hamilton House. While all were in agreement that Bielert should be replaced, they decided that NOP should not terminate his employment in deference to his physical health and years of service to NOP. Wally Zaremba suggested that NOP create a new job for Bielert, at no change in pay, wherein he would oversee the maintenance operations of all NOP properties. The Snavely Group, owners of Hamilton House, accepted the idea and offered to absorb some of Bielert's salary costs in the new position.
 
 
 15
 Following the meeting, on March 17, 1983, Tim Zaremba met with Bielert and explained that he was being removed as property manager at Hamilton House due to owner dissatisfaction. Bielert was replaced by Don Wudske, a Jehovah's Witness. Zaremba informed Bielert that the company valued his maintenance experience and explained that they intended to give Bielert a lateral transfer into a new position with no change in pay. Bielert was informed that his new job would entail on-site inspections at all NOP properties and the training of custodial maintenance personnel. Bielert and Zaremba concluded their meeting by agreeing to meet again to consider the specifics of the new position.
 
 
 16
 Bielert later met with Louis Leone and discussed the new position. Leone explained that the position was created in an effort to retain Bielert and make use of his expertise, not because NOP felt that the job was indispensable for its operations. Bielert expressed reservations about facing resentment from other property managers, and Leone offered to meet with the individuals, explain Bielert's new duties, and work to solidify Bielert's position in the company. Subsequent to this meeting, Leone published a memo to the office explaining Bielert's job change.
 
 
 17
 Bielert continued to express reservations to Leone about the new position. In response, Leone informed Bielert that if he was uncomfortable with the new position, NOP could, alternatively, provide Bielert a severance package consisting of six months' severance pay and a six-month continuation of other employee benefits, including health insurance. Bielert contends that he was informed that this package would be better than the company looking for ways to terminate him. Bielert requested that he be given a week off with pay to think about the proposal, and his request was granted.
 
 
 18
 After weighing the decision for five days, Bielert called Leone to inform him that he had decided to resign and accept the severance package offer. Bielert also sent a lengthy letter to Tim Zaremba, dated April 20, 1983, wherein he acknowledged his decision to accept the severance package. The letter was, however, less than complimentary of NOP and its officers. Although the letter reflects Bielert's subjective belief that he accepted the severance package because he "had no choice" as he felt that he "was going to be terminated one way or the other," the letter mentions nothing about religion nor any dissatisfaction with the severance package. In fact, Bielert remained on the payroll and accepted continued employee benefits, including health insurance, for the full six months. After exhausting his severance package, he filed a religious discrimination charge with the Equal Employment Opportunity Commission on September 30, 1983.
 
 II.
 
 19
 Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an individual on the basis of his or her race, color, religion, sex, or national origin. 42 U.S.C. Sec. 2000e-2(a). In order to establish that he was discharged in violation of Title VII, "[a] plaintiff must show ' that he is a member of a class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position.' " Morvay v. Maghielse Tool and Die Co., 708 F.2d 229, 233 (6th Cir.) (quoting Potter v. Goodwill Indus., 518 F.2d 864, 865 (6th Cir.1975)), cert. denied, 464 U.S. 1011 (1983). On appeal Bielert contends that the district court erred in concluding that there was no material dispute on the issue of constructive discharge and therefore entering summary judgment for NOP.[1]
 
 
 20
 As this court has previously held, "a constructive discharge exists if working conditions are such that a reasonable person would feel compelled to resign ... and 'requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee.' " Henry v. Lennox Indus., Inc., 768 F.2d 746, 752 (6th Cir.1985) (quoting Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir.1982)). Accord Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir.1987). In this case, Bielert contends that the proposed job change at NOP would have been considered intolerable by a reasonable employee because (1) the job was new, (2) there was no opportunity of upward mobility, and (3) there was a possibility that he could be terminated in the future for not performing the new job adequately. In sum, he contends that a reasonable person in his shoes would have felt compelled to resign.
 
 
 21
 In analyzing a claim of constructive discharge, an "employee's perception of his situation is judged objectively[,] [and] 'an employee may not be unreasonably sensitive to his working environment.' " Henry, 768 F.2d at 752 n. 3 (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir.1981)). Reasonableness is determined on a case-by-case basis. Easter v. Jeep Corp., 750 F.2d 520, 522 (6th Cir.1984). Moreover, "[p]roof of discrimination alone is not a sufficient predicate for a finding of constructive discharge; there must be other 'aggravating factors.' " Geisler v. Folsom, 735 F.2d 991, 996 (6th Cir.1984) (quoting Clark v. Marsh, 665 F.2d 1168, 1173-74 (D.C.Cir.1981)).
 
 
 22
 In reviewing the record, we first note that Bielert did not work even one day in the proposed new position. As one court has recognized, a failure to make any attempt to try out a job change or reassignment generally suggests against a finding of constructive discharge. See Fancher v. Nimmo, 549 F.Supp. 1324, 1333 (E.D.Ark.1982). The fact that the new job entails different or even a lessened responsibility than one's old job does not, in and of itself, amount to a constructive discharge. See Jett v. Dallas Independent School District, 798 F.2d 748 (5th Cir.1986) (loss of head football coaching responsibilities did not rise to the level of difficult or impossible working conditions); Craft v. Metromedia, Inc., 766 F.2d 1205 (8th Cir.1985) (reassignment of a news anchor to the position of news reporter did not amount to a constructive discharge), cert. denied, 475 U.S. 1058 (1986).
 
 
 23
 Moreover, Bielert's concern that the new job was undefined and would be of possible short duration is insufficient to create a material dispute on the issue of constructive discharge. As the Eleventh Circuit has recognized, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987) (emphasis supplied). An employer does not constructively discharge an employee simply by advising him that he must be productive in order to retain his new job. We agree with the Seventh Circuit that "[a]n employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting. Were it otherwise, any employee about whom there was a dissatisfaction would have a jury case ... even if the dissatisfaction were supported by objective indicators (such as low productivity)." Henn v. National Geographic Society, 819 F.2d 824, 830 (7th Cir.), cert. denied, 108 S.Ct. 454 (1987). In sum, an employee's concern of little chance of future advancement does not establish a constructive discharge. See Caslin v. General Electric Company, 696 F.2d 45 (6th Cir.1982) (per curiam).
 
 III.
 
 24
 We hold that the district court was correct in that Bielert has failed to establish that a genuine dispute of material fact exists on the issue of constructive discharge. He was given a lateral job transfer at his same rate of pay and was informed that his employer would work with him to make the transition a smooth one. Simply stated, Bielert's concerns about the vagaries of the proposed job and that he might be terminated in the future for poor performance are inadequate to avoid summary judgment. In this case, the evidence "is so one-sided that [NOP] must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512 (1986). The only possible conclusion that a reasonable person could reach from a review of the record is that Bielert terminated his employment with NOP of his own volition and was not constructively discharged.
 
 
 25
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 As we have previously recognized, "constructive discharge is, at least partially, a question of law and therefore must be reviewed by this court de novo." Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir.1987). Thus, it is amenable to disposition through summary judgment